Rabbi Abraham GROSSBAUM and Lubavitch of Indiana, Inc., Plaintiffs–Appellants,

v.

INDIANAPOLIS–MARION COUNTY BUILDING AUTHORITY and Ronald L. Reinking, in his Capacity as General Manager, Defendants–Appellees.

No. 95–3976.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 6, 1996.

Decided Nov. 20, 1996.

Nathan Lewin (argued), Niki Kuckes, David S. Cohen, Miller, Cassidy, Larroca & Lewin, Washington, DC, B. Keith Shake, Henderson, Daily, Withrow & Devoe, Indianapolis, IN, for Plaintiffs-Appellants.

Thomas J. Costakis, Krief, Devault, Alexander & Capehart, Indianapolis, IN, for Defendants-Appellees.

Before CUMMINGS, BAUER, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

This case presents the issue of what role a government body's motive plays in constitutional analysis when that body tries to regulate speech in a nonpublic forum. The Indianapolis–Marion County Building Authority amended its rules and regulations to prohibit private groups and individuals from exhibiting displays in the lobby of its City–County Building. This rule prevented the plaintiffs from displaying a menorah in the lobby as they had done for eight years between 1985 and 1992. The plaintiffs sought a preliminary injunction against the new rule so they could again display their menorah. The plaintiffs contended that even though the rule is viewpoint-neutral, its adoption was motivated by an unconstitutional desire to retaliate against the plaintiffs for previous litigation and to discriminate against their religious viewpoint. The District Court denied the motion for the preliminary injunction. Because we hold that the motive of a government body is irrelevant when it enacts a content-neutral rule that regulates speech in a nonpublic forum, we affirm.

## I. HISTORY

This is the second time that this case has come before us. *See Grossbaum v. Indianapolis–Marion County Building Authority,* 63 F.3d 581 (7th Cir.1995) (*Grossbaum I* ). In the previous appeal, Rabbi Grossbaum and Lubavitch of Indiana, Inc.[1] ("Lubavitch") successfully challenged a policy of the Indianapolis–Marion County Building Authority ("Building Authority") that prohibited *religious* displays and symbols (such as the plaintiffs' menorah) in the lobby of the City–County Building[2] in Indianapolis. We held that "the prohibition of the menorah's message because of its religious perspective was unconstitutional under the First Amendment's Free Speech Clause." *Grossbaum I,* 63 F.3d at 592. This second appeal now challenges a new Building Authority policy that prohibits *all* private displays, religious or otherwise.

From 1985 to 1992, Rabbi Grossbaum displayed a five-foot high, wooden menorah each year in the City–County Building lobby. In 1993, however, the Indiana Civil Liberties Union ("ICLU") and the Jewish Community Relations Council ("JCRC") both asked the Building Authority to change its policy. The ICLU argued that religious displays in a nonpublic forum violated the Establishment Clause and that the Building Authority should therefore designate the lobby as a "public forum" to make it clear that all groups would have access to the lobby. The JCRC, meanwhile, wrote a letter to the Building Authority asking that all religious displays be banned so that groups such as the Ku Klux Klan could not use the menorah's presence as an argument for letting in their religious displays.

Expressing concern about losing control over the lobby if it became a public forum, the Building Authority Board of Directors in late 1993 banned all religious displays, thus simultaneously satisfying the JCRC and mooting the ICLU's Establishment Clause complaint. Lubavitch, however, sought a preliminary injunction against the policy, alleging that it was an unconstitutional exclusion of speech protected by the First Amendment. As mentioned above, this court agreed and granted Lubavitch injunctive relief. 63 F.3d at 582.

After our August 1995 decision, however, the Building Authority Board again modified

---

1. Lubavitch is "an organization of Hasidic Jews who follow the teachings of a particular Jewish leader, the Lubavitch Rebbe. The Lubavitch movement is a branch of Hasidism, which itself is a branch of orthodox Judaism." *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter,* 492 U.S. 573, 587 n. 35, 109 S.Ct. 3086, 3098 n. 35, 106 L.Ed.2d 472 (1989) (citations omitted).

2. The City–County Building in downtown Indianapolis is the seat of government for the City of Indianapolis and the County of Marion, Indiana. The defendant Building Authority is a municipal corporation that administers the building.

its lobby display policy. At its October 2, 1995 meeting, the Board amended Rule 13 of its "Rules and Regulations Governing The City–County Building and Grounds" to read, in part:

> No displays, signs or other structures shall be erected in the common areas by any non-governmental, private group or individual since such objects may interfere with unobstructed and safe ingress and egress by employees of the governmental tenants and by the general public conducting business with government offices and courts in the City–County Building.

On November 29, 1995, Lubavitch amended its original complaint and again sought a preliminary injunction to allow the display of its menorah. Although Rule 13 is content-neutral, Lubavitch claimed that the Board enacted the new rule with an unconstitutional intent. More specifically, Lubavitch alleged two counts under 42 U.S.C. § 1983: 1) that the Board intended to retaliate against Lubavitch for exercising its right to seek judicial relief and its right to speak in the City–County Building lobby, and 2) that the Board intended to perpetuate the viewpoint discrimination that the Board had earlier attempted when it banned all religious displays in the lobby.

Lubavitch offered three general categories of evidence to support its claims of unconstitutional motive. First, Lubavitch claimed that the Building Authority enacted Rule 13 in a surreptitious manner. Rule 13 was adopted less than two months after this court's decision in favor of Lubavitch, and the only public notice that the Board might change Rule 13 at its October 1995 meeting was a vague agenda item referring to "Policies on Use of Common Areas." The Building Authority responded, however, that it had at all times followed Indiana's Open Door Law procedures. Second, Lubavitch disputed the Board's justification for the new Rule 13. According to the Board's minutes, the Board banned private displays to assure the free flow of pedestrian traffic in the lobby. The minutes also state that lobby congestion was a particular concern of the Board after it had approved new security measures (such as metal detectors in the

lobby) in June 1995. Lubavitch, however, argued that there was no history of displays disrupting lobby traffic that would justify banning all private displays. Third, Lubavitch cited deposition testimony by Board members that it was the Board's intent to ban religious displays. The Building Authority countered that the testimony was taken out of context in that the admission of a desire to ban religious displays was merely a logical implication of the Board's broader desire to ban all private displays.

The District Court denied Lubavitch's motion for a preliminary injunction, finding that the plaintiffs had not shown a reasonable likelihood of prevailing on either their retaliation or their viewpoint discrimination claim. 909 F.Supp. 1187, 1211 (S.D.Ind.1995). The court held that although the new Rule 13 was a *response* to Lubavitch's prior litigation, the rule "remedied the constitutional violation and was not motivated by any desire to punish plaintiffs or to get even with them for filing suit." *Id.* Similarly, the court found that the Board's decision was not "a mask for a desire to prohibit the expression of these plaintiffs' or others' religious beliefs." *Id.* Because the balance of harms to the parties was not lopsided, the District Court therefore denied the preliminary injunction. Lubavitch appealed pursuant to 28 U.S.C. § 1292(a)(1), which gives us jurisdiction to review interlocutory orders that deny injunctive relief.

## II. ANALYSIS

### A. *Standard of Review*

In considering a motion for a preliminary injunction, a district court must first determine whether the moving party has demonstrated 1) some likelihood of prevailing on the merits, and 2) an inadequate remedy at law and irreparable harm if preliminary relief is denied. If the movant demonstrates both, the court must then consider 3) the irreparable harm the nonmovant will suffer if preliminary relief is granted, balanced against the irreparable harm to the movant if relief is denied, and 4) the public interest, meaning the effect that granting or denying the injunction will have on nonparties. *Er-*

*ickson v. Trinity Theatre, Inc.,* 13 F.3d 1061, 1067 (7th Cir.1994).

When we review a trial court's grant or denial of a preliminary injunction, we subject findings of fact to clear error review, Fed.R.Civ.P. 52(a); we review a trial court's discretionary balancing of factors under an abuse of discretion standard, *Gould v. Lambert Excavating, Inc.,* 870 F.2d 1214, 1217 (7th Cir.1989); and we review a trial court's legal conclusions *de novo, West Allis Memorial Hosp., Inc. v. Bowen,* 852 F.2d 251 (7th Cir.1988).

### B. The Role of Motive in Constitutional Doctrine

Before addressing Lubavitch's specific claims of retaliation and viewpoint discrimination, a few words are appropriate to consider exactly when and why the motives of government actors are relevant in constitutional analysis. Both parties in this case seem to assume that if the Building Authority Board was motivated by an intent to retaliate against Lubavitch or to discriminate against religious viewpoints then *ipso facto* the Board violated the Constitution. This leap from nefarious motive to constitutional violation, however, is by no means an automatic one under constitutional case law.

Motive is, of course, relevant to .a number of constitutional claims. In Equal Protection Clause analysis, for example, courts often must inquire into the motives of legislators or other government actors.[3] *See, e.g., Miller v. Johnson,* —— U.S. ——, ——, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995) (voting district violates Constitution if race was "the predominant factor motivating the legislature's decision to place a significant number of voters within or without" the district); *Batson v. Kentucky,* 476 U.S. 79, 93, 106 S.Ct. 1712, 1721, 90 L.Ed.2d 69 (1986) (prosecutor's peremptory challenges are unconstitutional if based solely on purposeful racial discrimination). Similarly, cases under the Establishment Clause or the Bill of Attainder Clauses[4] may require courts to query the subjective intentions of legislators for possible illicit motives. *See, e.g., Edwards v. Aguillard,* 482 U.S. 578, 585, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987) (legislature's "actual purpose" to promote religion invalidates statute); *United States v. Lovett,* 328 U.S. 303, 313–14, 66 S.Ct. 1073, 1077–78, 90 L.Ed. 1252 (1946) (circumstances of bill's passage showed that its purpose was to punish particular individuals).

The relevance of motive in these instances of constitutional adjudication does not, however, allow the inductive conclusion that a

3. Although courts are often loose in their phraseology, the inquiry that courts *occasionally* make into the subjective "intent," "motive," or "actual purpose" of government actors should not be confused with the inquiry courts *always* must make in Equal Protection Clause cases to determine whether a classification advances any legitimate government "purpose," "interest," or "end". The former inquiry requires courts to examine whether the actual thoughts of government officials were constitutionally pure. In Justice Cardozo's words, it requires judges to "psychoanalyze" legislators. *See United States v. Constantine,* 296 U.S. 287, 299, 56 S.Ct. 223, 228–29, 80 L.Ed. 233 (1935) (Cardozo, J., dissenting). The latter inquiry, however, requires courts to consider only whether "any state of facts reasonably may be conceived to justify" the classification. *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961); *see also* Alexander M. Bickel, *The Least Dangerous Branch* 209 (1962) ("[A] determination of 'purpose' ... is either the name given to the Court's objective assessment of the effect of a statute or a conclusionary term denoting the Court's independent judgment of the constitu-

tionally allowable end that the legislature could have had in view.").

The subjective motivations of government actors should also not be confused with what the Supreme Court recently referred to, in a Free Exercise Clause case, as the "object" of a law. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 533, 113 S.Ct. 2217, 2227, 124 L.Ed.2d 472 (1993). The Court there determined that three ordinances impermissibly "had as their object the suppression of religion." *Id.* 508 U.S. at 542, 113 S.Ct. at 2231. The Court made this determination by analyzing both the text and the effect in "real operation" of the ordinances. *Id.* at 531–42, 113 S.Ct. at 2226–31. The Court did not, however, analyze the motive behind the ordinances. Justice Kennedy's investigation into motive (in Part IIA–2 of his opinion) was joined by only Justice Stevens.

4. Article I, § 9, cl. 3 of the U.S. Constitution provides: "No Bill of Attainder or ex post facto Law shall be passed." Article I, § 10, cl. 1 provides: "No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts...."

universal, all-purpose cause of action exists whenever a plaintiff can allege an unconstitutional motive. In a Free Speech Clause case, for example, the Supreme Court went so far as to say that "it is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien,* 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968). Although that statement may be hyperbole, one constitutional commentator has concluded that, rather than focusing on motive, "most descriptive analyses of First Amendment law, as well as most normative discussions ... have considered the permissibility of governmental regulation of speech by focusing on the effects of a given regulation." Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine,* 63 U. Chi. L.Rev. 413, 413 (1996); *cf. McCray v. United States,* 195 U.S. 27, 56, 24 S.Ct. 769, 776, 49 L.Ed. 78 (1904) ("The decisions of this court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted.").

Even in the Equal Protection Clause context, the Supreme Court has occasionally been reluctant to question legislative and administrative motive. In *Palmer v. Thompson,* 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), the City of Jackson, Mississippi had decided to close its public swimming pools rather than desegregate them under court order. The Supreme Court, faced with facts obviously analogous to the case we now consider, explicitly declined to inquire into the city council's motives for closing the pools. *Id.* at 224–26, 91 S.Ct. at 1944–46. The Court upheld the closings because the petitioners had shown "no state action affecting blacks differently from whites." *Id.* at 225, 91 S.Ct. at 1945.

■ A number of factors explain this reluctance to probe the motives of legislators and administrators. For starters, the text of the Constitution prohibits many government actions but makes no mention of governmental *mentes reae* (*i.e.,* guilty minds). The First Amendment, for example, forbids Congress and (through the Fourteenth Amendment's Due Process Clause) the States from making laws "abridging the freedom of speech"—a far different proposition than prohibiting the intent to abridge such freedom. "We are governed by laws, not by the intentions of legislators." *Conroy v. Aniskoff,* 507 U.S. 511, 519, 113 S.Ct. 1562, 1567, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring in judgment). Just as we would never uphold a law with unconstitutional effect because its enactors were benignly motivated, an illicit intent behind an otherwise valid government action indicates nothing more than a failed attempt to violate the Constitution. *See Church of the Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 558–59, 113 S.Ct. 2217, 2240, 124 L.Ed.2d 472 (1993) (Scalia, J., concurring in part and concurring in judgment); *see also* Laurence H. Tribe, *The Mystery of Motive, Private and Public: Some Notes Inspired by the Problems of Hate Crime and Animal Sacrifice,* 1993 Sup. Ct. Rev. 1, 23.

Beyond these theoretical objections to investigating motive, practical considerations also suggest caution. Government actions may be taken for a multiplicity of reasons, and any number of people may be involved in authorizing the action. Doubting the propriety of judicial searches for corrupt motives, Chief Justice Marshall thus asked:

> Must it be direct corruption, or would interest or undue influence of any kind be sufficient? Must the vitiating cause operate on a majority, or on what number of the members? Would the act be null, whatever might be the wish of the nation, or would its obligation or nullity depend upon the public sentiment?

*Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 130, 3 L.Ed. 162 (1810). Moreover, once a court finds an illicit motive, may the legislature or administrative body ever take the same action again without the imputation of improper intent? The Court in *O'Brien* declined to strike down a law allegedly tainted by improper motive in part because Congress could then reenact the law "in its exact form if the same or another legislator made a 'wiser' speech about it." 391 U.S. at 384; *see*

*generally* John Hart Ely, *Legislative and Administrative Motivation in Constitutional Law,* 79 Yale L.J. 1205, 1212–17 (1970).

In short, the relevance of motive to constitutional adjudication varies by context. No automatic cause of action exists whenever allegations of unconstitutional intent can be made, but courts will investigate motive when precedent, text, and prudential considerations suggest it necessary in order to give full effect to the constitutional provision at issue.

## C. *Lubavitch's Retaliation Claim*

Turning now to the plaintiffs' specific claims, Lubavitch first alleges that the Building Authority's adoption of Rule 13 was in retaliation for plaintiffs' exercise of their free speech rights and for their exercise of their right to petition the courts for redress of grievances. Lubavitch undoubtedly has such rights.[5] Whether Lubavitch also has a legitimate cause of action for retaliation, however, is another matter.

The plaintiffs cite numerous cases for the general proposition that "an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper." *Howland v. Kilquist,* 833 F.2d 639, 644 (7th Cir.1987). Indeed, there seems to have been an assumption in this litigation that Lubavitch would win if it could show that the Building Authority enacted Rule 13 out of a desire to punish Lubavitch for the exercise of its constitutional rights.

Claims of retaliation admittedly almost always turn on the issue of motive. *See, e.g., Perry v. Sindermann,* 408 U.S. 593, 598, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972) (holding that a public employee must show "the decision not to renew his contract was, in fact, made in retaliation for his exercise of the constitutional right of free speech"). An examination of the cases cited in the briefs, however, indicates that both parties fundamentally misconceive the nature of retaliation claims. The broad, sweeping language cited by the parties is belied by the facts of the cases themselves. Indeed, to allow a retaliation cause of action against the Building Authority in this case would be a huge and unwarranted extension of established retaliation doctrine.

Of the 21 cases cited in the briefs and referenced in the District Court's opinion regarding the proper standard for retaliation claims, 16 were claims brought by either public employees or prisoners.[6] Those numbers alone should have suggested caution when considering Lubavitch's atypical retaliation claim. More tellingly, however, *all* of the cases cited involved challenges to discretionary government actions taken vis-a-vis individual citizens. *None* of these cases in-

---

**5.** Lubavitch presumably is referring to its rights under the Free Speech Clause and the Petition Clause. The Petition Clause of the First Amendment prohibits Congress from making any law "abridging ... the right of the people ... to petition the Government for a redress of grievances." The Supreme Court has held that this right to petition includes the right of access to the courts. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972). The Court has also held that both the Free Speech Clause and the Petition Clause apply to the States through the Fourteenth Amendment's Due Process Clause. *See Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138 (1925); *Edwards v. South Carolina,* 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963).

**6.** *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983); *Board of Education v. Pico,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982); *Mt. Healthy*

*City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469 (7th Cir.1995); *Hale v. Townley,* 19 F.3d 1068 (5th Cir.1994); *Gagliardi v. Village of Pawling,* 18 F.3d 188 (2d Cir.1994); *Cromley v. Board of Education,* 17 F.3d 1059 (7th Cir.1994); *Gooden v. Neal,* 17 F.3d 925 (7th Cir.1994); *Brookins v. Kolb,* 990 F.2d 308 (7th Cir.1993); *Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307 (7th Cir.1989); *Rakovich v. Wade,* 850 F.2d 1180 (7th Cir.1988) (en banc); *Harris v. Fleming,* 839 F.2d 1232 (7th Cir.1988); *Howland v. Kilquist,* 833 F.2d 639 (7th Cir.1987); *Button v. Harden,* 814 F.2d 382 (7th Cir.1987); *Harvey v. Merit Systems Protection Bd.,* 802 F.2d 537 (D.C.Cir.1986); *Perry v. Larson,* 794 F.2d 279 (7th Cir.1986); *Knapp v. Whitaker,* 757 F.2d 827 (7th Cir.1985); *Matzker v. Herr,* 748 F.2d 1142 (7th Cir.1984); *Egger v. Phillips,* 710 F.2d 292 (7th Cir.1983); *Buise v. Hudkins,* 584 F.2d 223 (7th Cir.1978); *Burton v. Kuchel,* 865 F.Supp. 456 (N.D.Ill.1994).

volved a challenge to the mere adoption of a rule, let alone a prospective and generally applicable rule like the Building Authority's Rule 13.

Indeed, retaliation case law demonstrates that retaliation causes of action are challenges to the *application* of governmental rules, not to the rules themselves. Consider a typical retaliation case. A public employee will claim that she was denied a promotion because she has exercised some right, say affiliating with a certain political party. The government employer typically responds that the employee failed to get the promotion not because of her politics but because of some independent, neutral rule (*e.g.,* she was less qualified than other applicants). The employee never disputes that the independent reason is a valid criterion. Rather, the employee will allege only that the rule is being applied arbitrarily or unequally to her.

Retaliation claims are undoubtedly vital to constitutional law. No matter how constitutionally sound a given rule may be, the repeated misapplication or selective application of the rule could create an entirely unconstitutional policy. An official hiring policy that disregards political affiliation, for example, could be no different in its objective, discernible effect than a policy of hiring only Democrats if the official policy is misapplied or ignored.

■ Nonetheless, courts will not sustain a retaliation claim where a plaintiff challenges only the enactment of a prospective, generally applicable rule. Executive and legislative branches of government must not be paralyzed by the prospect of a retaliation claim (and the attendant fact-based motive inquiry[7]) whenever they make new policy that is arguably in response to someone's speech or lawsuit. Suppose, for example, that a group of drug addicts successfully sues

to get disability benefits for their addiction and Congress subsequently amends the law to prohibit benefits to drug addicts. No one would reasonably suggest that Congress's motives would then be subject to a retaliation inquiry just because it acted in response to the addicts' success in the courts.

Plaintiffs can, of course, attack the substance of a rule as being facially unconstitutional. *See, e.g., Saia v. New York,* 334 U.S. 558, 559–60, 68 S.Ct. 1148, 1149, 92 L.Ed. 1574 (1948) (striking down ordinance giving unfettered discretion to local officials regarding speaker permits); *United Pub. Workers v. Mitchell,* 330 U.S. 75, 100, 67 S.Ct. 556, 569–70, 91 L.Ed. 754 (1947) (Congress may not "enact a regulation providing that no Republican ... shall be appointed to federal office, or that no federal employee shall attend Mass or take any active part in missionary work"). And government officials cannot escape a retaliation claim simply by dressing up individualized government action to look like a general rule. A policy that prohibited all lobby displays by groups that had put up displays during the previous December, for example, would be neither prospective nor generally applicable. Plaintiffs may not, however, use a retaliation claim to challenge a truly prospective and generally applicable rule that is even-handedly enforced.

■■ In short, retaliation claims protect constitutional rights only against their *unequal* infringement. We recognized as much in *Vukadinovich v. Bartels,* 853 F.2d 1387 (7th Cir.1988), where a teacher brought both retaliation and equal protection claims after he was dismissed, allegedly for statements he had made to a local newspaper. After disposing of the retaliation claim, we said his equal protection claim alleged "only that he was treated differently because he exercised his right to free speech" and thus was "a mere rewording of plaintiff's First Amend-

---

**7.** Pretext and motive are almost automatically relevant in retaliation cases because courts cannot easily determine whether the government is applying its rules equally and fairly. Because cases come before courts one at a time, the details of any particular case may obscure a covert pattern of discrimination against those exercising certain constitutional rights. The only indicator a judge may have of what policy was really being followed may be the motives of the government actors. Motive is relevant not because government officials' thoughts have any constitutionally-cognizable psychokinetic effect on constitutional rights, but rather because those thoughts are the best indicator to the courts of what policy the government is actually putting into effect. *Cf.* Kagan, *supra,* at 457 (discussing how courts cannot easily determine, in the context of administrative action, when a content-based decision has occurred).

ment-retaliation claim." *Id.* at 1391–92; *see also Thompson v. City of Starkville, Miss.,* 901 F.2d 456, 468 (5th Cir.1990) (dismissing plaintiff's equal protection claim in retaliation case because it "amount[ed] to no more than a restatement of his first amendment claim"). In other words, retaliation doctrine protects citizens against those individualized, discretionary government actions where the government's coercive power is greatest, not against government rules that affect both majority and minority alike.[8]

■ Returning to the specifics of this case, Rule 13 is unequivocally a prospective and generally applicable rule because it bans all private displays henceforth. Furthermore, no one has even hinted that the rule has been or is being applied unequally. Lubavitch therefore has not stated facts sufficient for a retaliation claim. To hold otherwise would be a significant expansion of retaliation doctrine and would encourage only litigiousness and governmental paralysis.

D. *Lubavitch's Viewpoint Discrimination Claim*

■ Although its retaliation claim can be dismissed with relative ease, Lubavitch presents a more colorable viewpoint discrimination claim. Here Lubavitch alleges that, regardless of whether the Building Authority wanted to retaliate because of Lubavitch's litigation success, the Building Authority's overarching intent to discriminate against the menorah display (and against religious displays generally) makes Rule 13 an unconstitutional viewpoint-based regulation of speech.[9]

■ Because the City–County Building lobby is government property, the constitutionality of a regulation of speech on that property hinges on what has been called "forum analysis." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). Although "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property," *id.* at 799–800, 105 S.Ct. at 3447, any regulation of speech on government property must still withstand some constitutional scrutiny.

■ The exact constitutional standard depends on whether the government is trying to regulate a "public forum" or a "nonpublic forum." Property can be designated as a public forum either by tradition or by law. *Capitol Square Review and Advisory Bd. v. Pinette,* —— U.S. ——, ——, 115 S.Ct. 2440, 2446, 132 L.Ed.2d 650 (1995). Traditional public fora are properties like streets and parks which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983) (quoting *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (opinion of Roberts, J.)). Legally created public fora are fora such as school board meetings and municipal theaters where the government has intentionally—not by inaction or by permitting limited discourse—opened a nontraditional forum for public discourse. *See Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449; *Perry,* 460 U.S. at 45–

---

**8.** We do not imply, however, that retaliation claims arise under the Equal Protection Clause. That clause does not establish a general right to be free from retaliation. *Ratliff v. DeKalb County, Ga.,* 62 F.3d 338, 341 (11th Cir.1995); *see also Nestor Colon Medina & Sucesores, Inc.. v. Custodio,* 964 F.2d 32, 43–45 (1st Cir.1992). We suggest only that the retaliation protection provided by other clauses of the Constitution is limited to claims against the unequal application of discretionary government power.

**9.** Although Lubavitch's viewpoint discrimination claim clearly derives from a long line of Free

Speech Clause case law, Lubavitch argues on appeal that amended Rule 13 also violates the Establishment Clause. Lubavitch's general invocation of the First Amendment in its complaint, however, is far too broad to preserve an Establishment Clause claim raised for the first time on appeal. Like the Fourteenth Amendment, the First Amendment is "a vast umbrella, and to preserve a claim under it for consideration by an appellate court you must tell the court just what spot of ground beneath the umbrella you're standing on." *Yatvin v. Madison Metro. Sch. Dist.,* 840 F.2d 412, 420 (7th Cir.1988).

46, 103 S.Ct. at 955. Any remaining government property is considered a nonpublic forum. *International Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678–79, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992).

 Given their greater importance to the free flow of ideas, public fora receive greater constitutional protection from speech restrictions. Any speech regulation in a public forum must be either 1) a reasonable, content-neutral time, place, and manner restriction, or 2) narrowly drawn to advance a compelling state interest. *Capitol Square,* — U.S. at ——, 115 S.Ct. at 2446. As Justice Brennan explained in his *Perry* dissent, content-neutrality is a particularly strong constitutional standard that "prohibits the government from choosing the subjects that are appropriate for public discussion." *Perry,* 460 U.S. at 59, 103 S.Ct. at 962 (Brennan, J., dissenting). In other words, content-neutrality not only forbids discrimination against particular viewpoints on a subject (what Justice Brennan called "censorship in its purest form," *id.* at 62, 103 S.Ct. at 964), but also prevents the government from even limiting discussion in public fora to specific subjects. A content-neutral regulation is thus both viewpoint-neutral and subject-neutral. *See Rosenberger v. Rector and Visitors of the Univ. of Va.,* — U.S. ——, ——, 115 S.Ct. 2510, 2517, 132 L.Ed.2d 700 (1995) ("[D]iscrimination against one set of views or ideas is but a subset or particular instance of the more general phenomenon of content discrimination.").

 The constitutional standard governing speech regulations in nonpublic fora is less certain. The Supreme Court has elaborated on the standard in a number of cases, but the Court's language has not always been entirely consistent. The cases have unequivocally held that any speech regulation in a nonpublic forum must be "reasonable in light of the purposes served by the forum." *Rosenberger,* — U.S. at ——, 115 S.Ct. at 2517; *Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, 392–93, 113 S.Ct. 2141, 2147, 124 L.Ed.2d 352 (1993); *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451; *Perry,* 460 U.S. at 49, 103 S.Ct. at 957; *see also U.S. Postal Service v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 131 n. 7, 101 S.Ct. 2676 n. 7, 2686, 69 L.Ed.2d 517 (1981). The cases have been less definitive, however, regarding the neutrality standard that a nonpublic forum speech regulation must meet. In *Postal Service v. Council of Greenburgh Civic Ass'ns,* the Court said that such speech restrictions must be content-neutral. *Id.* In *Perry* and *Cornelius,* however, the Court shifted its focus to viewpoint discrimination and particularly to the intent to discriminate against specific viewpoints. The Court stated that a regulation must not be "an effort to suppress expression merely because public officials oppose the speaker's view," *Perry,* 460 U.S. at 46, 103 S.Ct. at 955, and similarly that a regulation must not be "in reality a facade for viewpoint-based discrimination," *Cornelius,* 473 U.S. at 811, 105 S.Ct. at 3453–54. In its most recent cases, meanwhile, the Court has said that nonpublic forum regulations must be viewpoint neutral, making no mention of impermissible intent. *See Rosenberger,* — U.S. at ——, 115 S.Ct. at 2517; *Lamb's Chapel,* 508 U.S. at 393, 113 S.Ct. at 2147.

We need not decide whether the City–County Building lobby is a public forum because Lubavitch has conceded for the purposes of its preliminary injunction motion that the lobby is a nonpublic forum. We must determine, however, the appropriate standard under which to review Rule 13. The Court has clearly abandoned the content-neutrality standard, but the relevance of motive in the Court's opinions has varied. We must therefore determine whether the subjective language in *Perry* and *Cornelius* (suggesting that the mere intent to discriminate against a viewpoint is sufficient for a constitutional violation) survives the more recent cases that suggest a more objective measure of viewpoint-neutrality.

Whatever the Court's language in recent cases, the Court's actions are both more telling and more binding than any mere dicta. And the motive language in earlier cases cannot be dismissed as mere dicta because the Court in *Cornelius* remanded the case to determine whether the speech restriction at issue was "impermissibly motivated by a desire to suppress a particular point of view."

473 U.S. at 812–13, 105 S.Ct. at 3454. Nonetheless, we view the present case as distinguishable from these prior precedents because the Court never considered a *content-neutral* speech restriction like Rule 13. Rather, the Court's concern about motivation arose only in cases where the Court was considering speech restrictions that explicitly discriminated on the basis of content.

Motive becomes keenly relevant in cases that involve content discrimination because the line between viewpoints and subjects is such an elusive one. Because subject matter discrimination is clearly constitutional in non-public fora, *see Perry*, 460 U.S. at 49, 103 S.Ct. at 957, classifying a particular viewpoint as a subject rather than as a viewpoint *on a subject* will justify discrimination against the viewpoint. This inherent manipulability of the line between subject and viewpoint has forced courts to scrutinize carefully any content-based discrimination. *See Air Line Pilots Ass'n v. Department of Aviation*, 45 F.3d 1144, 1159–60 (7th Cir. 1995) (warning courts against retreating to an exaggerated level of generality when examining content-based regulations). Courts thus have struggled, for example, with the issue of whether religious discussion should be categorized as a subject (and therefore excludable from a nonpublic forum) or as a viewpoint (and therefore constitutionally protected). *See Rosenberger*, —— U.S. at —— —, 115 S.Ct. at 2517–18; *Grossbaum I*, 63 F.3d at 589–92. The Supreme Court faced a similar issue in *Cornelius* where it was understandably dubious of the argument that excluding all advocacy groups, regardless of political orientation, from a government charity drive was just subject matter discrimination rather than viewpoint discrimination. 473 U.S. at 811–12, 105 S.Ct. at 3454. Because the government was distinguishing among groups based on the content of their messages (either advocacy or nonadvocacy), the Court remanded the case to see whether the government was really targeting certain viewpoints.

 · Where, however, the government enacts a content-neutral speech regulation for a nonpublic forum, there is no concern that the regulation is "in reality a facade for viewpoint-based discrimination," *Cornelius*, 473 U.S. at 811, 105 S.Ct. at 3453–54. Whatever the intent of the government actors, all viewpoints will be treated equally because the regulation makes no distinctions based on the communicative nature or impact of the speech. A facade for viewpoint discrimination, in short, requires discrimination behind the facade (*i.e.*, some viewpoint must be disadvantaged relative to other viewpoints). Courts do have a hard call to make when they review content-based speech regulations because the government could be shutting out some viewpoints by labelling them as subjects. Motive may thus be a vital piece of evidence that courts must use to judge the viewpoint-neutrality of the regulation. When the government restricts speech in a content-neutral fashion, however, all viewpoints—from the Boy Scouts to the Hare Krishnas—receive the exact same treatment.[10]

Indeed, the Supreme Court suggested in *Capitol Square* that content-neutral regulations are free from motive inquiries even in public forum cases. The Court there considered the denial of a permit to the Ku Klux Klan for the erection of a Latin cross in a public forum, even after the government had granted permission for a Christmas tree and a menorah to be displayed. Eight members of the Court joined behind the proposition that the State of Ohio "could ban all unattended private displays in [the forum] if it so desired." *Capitol Square*, —— U.S. at ——,

---

**10.** It should be noted that content-neutrality requires not only facial neutrality but also some semblance of general applicability. *Cf. Church of the Lukumi Babalu Aye*, 508 U.S. at 531–46, 113 S.Ct. at 2226–33 (discussing neutrality and general applicability as the touchstones of Free Exercise Clause analysis); *id.* at 557–58, 113 S.Ct. at 2239 (Scalia, J., concurring in part and concurring in the judgment); *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 879–81, 110 S.Ct. 1595, 1600–01, 108 L.Ed.2d 876 (1990). A regulation. that prohibited all private groups from displaying nine-pronged candelabra may be facially neutral, but it would still be unconstitutionally discriminatory against Jewish displays. The lack of general applicability is obvious not from the government's motives but from the narrowness of the regulation's design and its hugely disproportionate effect on Jewish speech. *Cf.* Tribe, *supra*, at 34.

115 S.Ct. at 2457 (Souter, J., concurring in part and concurring in the judgment); *see also id.* at ——, 115 S.Ct. at 2446; *id.* at —— – ——, 115 S.Ct. at 2467–68 (Stevens, J., dissenting). This proposed course of action would seem impossible, however, if Ohio's undisputed desire to keep the Klan off of government property would be sufficient to establish viewpoint discrimination. And if eight justices thought Ohio was free, even after it had discriminated against the Klan, to ban all private displays in a public forum, then the Building Authority *a fortiori* should have the same freedom to prohibit all private displays in its nonpublic forum.[11]

■ In sum, content-neutral speech regulations in nonpublic fora pass constitutional muster regardless of motive for the same reason that retaliation claims are inoperative against generally applicable rules. When a government body acts at a sufficiently high level of generality, there is no need for courts to search the minds of government actors for invidious motives that might indicate unconstitutional discriminatory effect. And it is this unconstitutional effect that ultimately matters. "[A] facially neutral government action that does not in fact ... violate anyone's constitutional rights or any constitutional principle ... should not be rendered unconstitutional, or even suspect, just by virtue of the factors considered by, or the attitudes or intentions held by, the public officials responsible for that action...." Tribe, *supra,* at 28–29; *cf.* Kagan, *supra,* at 505–17.

Moreover, we are mindful of Judge Easterbrook's observation that real world actors such as the Building Authority need *ex ante* guidance from our decisions, not just *ex post* judicial critiques:

People are entitled to know the legal rules before they act, and only the most compelling reason should lead a court to announce an approach under which no one can know where he stands until litigation has been completed. Litigation is costly and introduces risk into any endeavor; we should

struggle to eliminate the risk and help people save the costs. Unless some obstacle such as inexperience with the subject, a dearth of facts, or a vacuum in the statute books intervenes, we should be able to attach legal consequences to recurrent factual patterns.

*Secretary of Labor v. Lauritzen,* 835 F.2d 1529, 1539 (7th Cir.1987) (Easterbrook, J., concurring). The past year of litigation, the more than 900 pages of depositions fishing for an inculpatory admission by the Building Authority, and the thousands of taxpayer dollars spent on legal expenses for this case only underscore the point. This motive game is not worth the candle.

■ The only possible issue remaining is whether Rule 13 is reasonable in light of the purposes served by the City–County Building lobby. Although Lubavitch did not explicitly challenge Rule 13 on reasonableness grounds separate from its viewpoint discrimination claim, Lubavitch clearly did argue that the unreasonableness of Rule 13 was evidence that the Building Authority's motives were pretextual. Assuming for the sake of argument that this was sufficient to raise the reasonableness issue, we are confident that the District Court did not abuse its discretion when it denied Lubavitch's motion for a preliminary injunction. "The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Cornelius,* 473 U.S. at 808, 105 S.Ct. at 3452. The District Court found a number of reasonable justifications for the new Rule 13, 909 F.Supp. at 1205, 1207, 1209–10, and all are well within the bounds of what rational basis scrutiny permits.

In closing, nothing in this opinion should be construed as undermining Lubavitch's hard-fought success in its previous appeal to this court. Lubavitch clearly struck a blow for the freedom of speech when it challenged

---

**11.** Our holding today is expressly limited to speech regulations in nonpublic fora. We express no opinion on the harder issue of whether motive is relevant in public forum cases. The nonpublic forum case is easier because of the stronger government interest in controlling property not dedicated to public discourse, *see Perry,* 460 U.S. at 49, 103 S.Ct. at 957, and because of the lesser role that nonpublic fora generally play in the marketplace of ideas, *see* Richard A. Posner, *Free Speech in an Economic Perspective,* 20 Suffolk U.L.Rev. 1, 52 (1986).

the Building Authority's earlier policy that discriminated against religious displays. Lubavitch's prior victory against the Building Authority does not, however, give Lubavitch immunity against all subsequent Building Authority actions that, although nondiscriminatory, happen to be disadvantageous to Lubavitch.

The decision of the District Court to deny preliminary injunctive relief is AFFIRMED.