EAST HIGH GAY/STRAIGHT ALLI-
ANCE, an unincorporated association;
Ivy Fox, a minor, by and through her
mother and next friend, Kay Kosow
Fox; Keysha Barnes, a minor by and
through her father and next friend,
James Barnes; and Leah Farrel, by
and through her mother and next
friend, Kelly Fogarty, Plaintiffs,

v.

BOARD OF EDUCATION OF SALT
LAKE CITY SCHOOL DISTRICT, a
body corporate of the State of Utah;
Darline Robles, Superintendent of
Salt Lake City School District, in her
official capacity; and Cynthia Seidel,
Assistant Superintendent, in her offi-
cial capacity, Defendants.

No. CIV. 2:98–CV–193J.

United States District Court,
D. Utah,
Central Division.

Jan. 8, 1999.

Daniel K. Slaughter, Heller Ehrman
White & McAuliffe, Laura M. Gray, Keller
& Lundgren LC, Salt Lake City, UT, Ste-
phen C. Clark, American Civil Liberties

Union, Salt Lake City, UT, David S. Buckel, Lambda Legal Defense and Education Fund, New York, NY, Jon W. Davidson, Lambda Legal Defense and Education Fund, Los Angeles, CA, Kelli M. Evans, American Civil Liberties Union, San Francisco, CA, Thomas E. Reiber, Heller Ehrman White & McAuliffe, Los Angeles, CA, Marlin G. Criddle, Salt Lake City, UT, for East High Gay/Straight Alliance.

Laura M. Gray Keller & Lundgren LC, Stephen C. Clark, American Civil Liberties Union, Salt Lake City, UT, David S. Buckel, Lambda Legal Defense and Education Fund, New York, NY, Jon W. Davidson, Lambda Legal Defense and Education Fund, Los Angeles, CA, Thomas E. Reiber, Heller Ehrman White & McAuliffe, Los Angeles, CA, Marlin G. Criddle, Salt Lake City, UT, for Kay Kosow Fox, James Barnes.

Dan R. Larsen, Utah Attorney General's Office, Salt Lake City, UT, Elizabeth King, Utah Attorney General's Office Litigation Unit, Salt Lake City, UT, for Board of Education of Salt Lake City School District, Darline Robles, Cynthia Seidel.

Daniel K. Slaughter, Heller Ehrman White & McAuliffe, Laura M. Gray, Keller & Lundgren LC, Salt Lake City, UT, Stephen C. Clark, American Civil Liberties Union, Salt Lake City, UT, David S. Buckel, Lambda Legal Defense and Education Fund, New York, NY, Jon W. Davidson, Lambda Legal Defense and Education Fund, Los Angeles, CA, Kathryn D. Kendall, San Francisco, CA, Thomas E. Reiber, Heller Ehrman White & McAuliffe, Los Angeles, CA, Marlin G. Criddle, Salt Lake City, UT, for Kelly Fogarty.

## MEMORANDUM OPINION
## AND ORDER

JENKINS, Senior District Judge.

On December 16, 1998, this case was heard on matters pertaining to discovery and pretrial scheduling. Stephen C. Clark appeared and spoke on behalf of plaintiffs; Dan R. Larsen appeared and spoke on behalf of the defendants. At that time, based upon the agreement of counsel, the discovery cutoff date was extended to January 29, 1999, the dispositive motion cutoff was extended to February 12, 1999, and the Final Pretrial Conference was rescheduled for April 16, 1999 at 9:30 a.m. The scope of remaining discovery was discussed, and this court took under advisement the question of the scope of deposition discovery involving past and present members of the defendant Board of Education.

The discovery concerns the Board's adoption on February 20, 1996 of the policy that remains the central focus of this lawsuit:

The Board of Education of Salt Lake City School District desires to promote and advance curriculum related to student clubs. However, the Board does not allow or permit student groups or student organizations which are not directly related to the curriculum to organize or meet on school property. It is the express decision of the Board of Education of Salt Lake City School District not to allow a "limited open forum" as defined by the Equal Access Act, 20 U.S.C. 4071.

■ Plaintiffs argue that under the First Amendment to the United States Constitution, applicable here by virtue of the Fourteenth Amendment, the February 20, 1996 Policy represents unlawful viewpoint-based exclusion of the East High Gay/Straight Alliance from the "limited public forum" [1] for student organizations existing at East High School.

■ Through oral depositions of board members, plaintiffs wish to explore the

1. A "limited *public* forum" for First Amendment purposes does *not* equate with a "limited *open* forum" for Equal Access Act purposes. *See Westside Community Board of Education v. Mergens,* 496 U.S. 226, 242, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). Thus, a First Amendment "limited public fo-

underlying policy justifications for the February 20, 1996 Policy and test whether the Board's "justifications are not simply 'post hoc rationalizations' or a pretext for viewpoint discrimination." *Summum v. Callaghan,* 130 F.3d 906, 920 (10th Cir. 1997). *See also Cornelius v. NAACP Legal Defense & Educational Fund,* 473 U.S. 788, 812, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) (valid and reasonable justifications "cannot save an exclusion that is in fact based on the desire to suppress a particular point of view").

Defendants steadfastly oppose discovery into the Board's motives in adopting the February 20, 1996 Policy, arguing that motive is irrelevant to the constitutionality of "contentneutral" governmental action, relying on *Grossbaum v. Indianapolis–Marion County Building Authority,* 100 F.3d 1287, 1288 (7th Cir.1996), and *Capitol Square Review and Advisory Board v. Pinette,* 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995).

■■■ This court has reviewed the memoranda and exhibits supplied by counsel as well as the pertinent authorities referred to therein. From that review, there appears to be a distinction between rules restricting expression in nonpublic forums or "limited public forums" based upon "content" and those that are based upon "viewpoint." Access to a nonpublic forum may be limited "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, 392–93, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (quoting *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439). On the other hand, "The government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439.

Where an entire subject matter has been carved out from the interchange of ideas in a particular forum, and not merely a particular viewpoint on that subject, the policy imposing that restriction may well be "viewpoint neutral" and may survive First Amendment scrutiny. To demonstrate that the February 20, 1996 Policy represents impermissible "viewpoint discrimination" under the First Amendment in light of *Cornelius, Lamb's Chapel* and *Summum,* plaintiffs must first identify the "includible subject" as to which their viewpoint is disfavored or excluded by the February 20, 1996 Policy.

Plaintiffs acknowledge that "discovery of the Board's motives should be 'deferential and limited,' and that testimony by individual Board members as to what they intended when they cast their votes is 'normally preclude[d].'" (Reply to Defendants' Supplemental Memorandum on Discovery Issues, filed December 15, 1998 (dkt. no. 89), at [2].) Such discovery should not be precluded here, plaintiffs assert, because the February 20, 1996 Policy "**is not content neutral.**" (*Id.* at [3] (emphasis in original).)

Defendants have *not* banned *all* student groups from meeting on high school campuses in the District. Instead, Defendants have allowed some student groups to continue to meet while banning others (those Defendants deem non-curricular). The distinction between those student groups that are allowed to meet and those that are not is, at a minimum, based on the content of what those groups discuss and the activities in which they engage. Thus, contrary to Defendants' assertions, their policy is neither "subject neutral" nor "content neutral."

(*Id.* at [4] (emphasis in original).)

However, where a limited open forum is concerned, a policy that is "viewpoint neutral" must be distinguished from a policy

rum" may yet exist where no Equal Access Act "limited open forum" has been created.

that is "content neutral."[2] A truly "content neutral" policy governing public property creates a traditional *public forum,* open to all viewpoints on all subjects. Yet government need not establish a traditional public forum in every instance. The Supreme Court has defined at least two additional categories: a *designated public forum* may be as open as a traditional public forum, but it may also "be created for a 'limited purpose' for use 'by certain speakers, or for the discussion of certain subjects.'" *Summum,* 130 F.3d at 914 (quoting *Perry Education Ass'n v. Perry Local Educators Ass'n,* 460 U.S. 37, 45–46 & n. 7, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)); and a *nonpublic forum* where speech may be limited "to reserve the forum for the specific official uses to which it is lawfully dedicated." *Id.* at 916. "When the government allows selective access to some speakers or some types of speech in a nonpublic forum, but does not open the property sufficiently to become a designated public forum, it creates a 'limited public forum.'" *Id.*

■ Arguably, by permitting selective access to school premises by "curriculum related" student groups to engage in "curriculum related" expression, the defendants have created a "limited public forum" for First Amendment purposes. In a limited public forum, "'the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others,'" that is to say, it forbids viewpoint discrimination. *Lamb's Chapel,* 508 U.S. at 394, 113 S.Ct. 2141 (quoting *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). However, as noted above, "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439.

Defendants argue that the February 20, 1996 Policy draws reasonable distinctions in light of the essential function of public high schools, and promotes the core purpose of the forum, *viz.,* to educate students in the subject matter encompassed within the schools' curricula. The policy excludes expression concerning non-curricular subject matter, regardless of viewpoint, as outside of the forum's purpose.

Plaintiffs' counsel concedes that it is "a subject matter that is being carved out," but asserts that the carving out was motivated by a desire to exclude plaintiffs' viewpoint. This assertion, however, does not suffice to allege impermissible viewpoint discrimination. Plaintiffs must identify the particular subject matter as to which expression is *permissible* within the limited public forum, but as to which plaintiffs' viewpoint has been wrongfully excluded.

In *Church on the Rock v. City of Albuquerque,* 84 F.3d 1273 (10th Cir.), *cert. denied,* 519 U.S. 949, 117 S.Ct. 360, 136 L.Ed.2d 251 (1996), a city permitted its senior citizen centers to host classes on the Bible from a literary, philosophical, and historical perspective, but prohibited instruction from a sectarian or religious viewpoint. The court of appeals held that in relation to the subject matter permitted in that forum, exclusion of a church film which advocated adopting Christianity as one's religion constituted viewpoint discrimination in violation of the First Amendment. *Id.* at 1279. In that in-

2.

[I]n determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations.

*Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819, 829–30, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

stance, the forum's permissible subject matter, *viz.,* study of the Bible, was defined.

Perhaps plaintiffs can similarly define the permissible subject matter as to which their viewpoint has allegedly been excluded under the February 20, 1996 Policy. To date, they have failed to do so. Absent that, there appears to be no substantial basis for permitting inquiry through oral deposition examination into individual Board members' motives and justifications for adopting that policy. While, as plaintiffs suggest, "courts must examine viewpoint-based restrictions with an especially critical review of the government's asserted justifications for those restrictions," *Church on the Rock,* 84 F.3d at 1279–80, that "especially critical review" must first be triggered by articulating the "viewpoint-based restriction" concerning a permissible subject matter—an articulation still lacking in this case to this point.[3]

A distinction also needs to be drawn between matters of legislative policymaking and matters of administrative action. The February 20, 1996 Policy appears to be just that—*a policy*—an exercise of the Board of Education's delegated legislative power to make policy and enact rules having general application to the operation of the district's schools. *See* Utah Code Ann. § 53A–2–108 (1997) ("Each school district shall be controlled by its board of education .... The local school board shall have direction and control of all school property in the district."); § 53A–3–402(14) (1997) ("a board shall make and enforce rules necessary for the control and management of the district schools"). The making of a general policy or rule differs in both form and substance from an administrative action, such as an ad hoc determination that a particular club or group may or may not meet or express its views on school premises during instructional or noninstructional time.

The *Summum* case, emphasized by plaintiffs, involved the latter type of action. At issue in *Summum* was whether a particular group was wrongfully denied permission to erect a stone monolith expressing its religious views on the front lawn of the county courthouse near a similar monolith inscribed with the Ten Commandments and erected by a private fraternal organization in 1971. The county had adopted no general legislative policy, rules, or regulations governing placement of private displays on county property. Rather, the county commission was acting on an ad hoc basis in exercising its "administrative power" over the county's property. 130 F.3d at 910. In remanding Summum's viewpoint discrimination claim for further proceedings, the Tenth Circuit emphasized that "[a]llowing government officials to make decisions as to who may speak on county property, without any criteria or guidelines to circumscribe their power, strongly suggests the potential for unconstitutional conduct, namely favoring one viewpoint over another." *Id.* at 920. No general policy or rule was at issue in *Summum.*

A general policy—not an ad hoc administrative decision—remains squarely at issue in this case.

Adopting a general policy or rule sets standards for subsequent administrative decisions in specific cases, and in this instance, guides the exercise of discretion by school administrators. It is essentially a legislative function. *See Kamplain v. Curry County Board of Commissioners,* 159 F.3d 1248, 1251 (10th Cir.1998) (" 'The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct.' ... [A]t its core, the legislative function involves determining, formulating and making policy." (quoting *Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 580 (9th Cir.1984))).

**3.** While *Church on the Rock* involved a "designated public forum" rather than a "nonpublic forum," 84 F.3d at 1278, that distinction is not material here.

Generally, the personal views and underlying motives of legislators in carrying out their legislative function and in adopting general policies and rules fall beyond the reach of judicial scrutiny. In sustaining legislative land grants in the face of allegations of sweeping legislative corruption in *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810), Chief Justice John Marshall expressed grave doubts concerning judicial inquiry into legislators' motives:

> It may well be doubted, how far the validity of a law depends upon the motives of its framers, and how far the particular inducements, operating on members of the supreme sovereign power of a state, ... are examinable in a court of justice. If the principle be conceded, that an act of the supreme sovereign power might be declared null by a court, in consequence of the means which procured it, still would there be much difficulty in saying to what extent those means must be applied to produce this effect. Must it be direct corruption? or would interest or undue influence of any kind be sufficient? Must the vitiating cause operate on a majority? or on what number of the members?
>
> . . . .

*Id.* at 130, 6 Cranch 87.

This court shares these same doubts. Inquiry into the personal motivations of individual legislators proves to be "a hazardous matter," problematic at best. *United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). In adopting a particular measure, a legislator may act from a variety of motivations, some laudatory, some not. Which of those motives should control for constitutional purposes?

Courts find much surer footing in first addressing the *effect* of a legislative enactment and in measuring whether it has a discriminatory effect on a particular group or viewpoint. Where an enactment operates to draw an inappropriate distinction between persons or viewpoints, and does so for an improper purpose, a court may act to remedy that inequality. Even a facially neutral rule may have a disparate impact, and a court may be called upon to examine the underlying justifications for the both the rule and the resulting disparity, and to that extent a court may be called upon to examine legislative motive. *See, e.g., Hunter v. Underwood,* 471 U.S. 222, 227, 233, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) (Alabama constitutional provision disenfranchising persons convicted of crimes involving "moral turpitude" violates equal protection because of its "racially discriminatory impact" coupled with a legislative motive "to discriminate against blacks on account of race"). Absent some disparate impact or other illicit consequence, however, scant justification exists for intruding into the deliberations of another branch of government. *See, e.g., Palmer v. Thompson,* 403 U.S. 217, 224–26, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971) (court would not inquire into city's motives in closing public swimming pools altogether rather than proceeding with court-ordered racial integration).

On its face, the February 20, 1996 Policy confines the permissible subject matter of the schools' limited public forum to things "curriculum related." All things not curriculum-related are excluded from the forum, regardless of particular subject matter or viewpoint. As explained above, plaintiffs have yet to articulate how this legislative rule has had a disparate impact upon their viewpoint. Absent at least an allegation of that kind of discriminatory effect, the court is not called upon to examine the actual motivations of members of the Board in adopting that policy.

If scrutiny of legislative motive would be inappropriate for the court itself to undertake at this stage of this case, it seems likewise inappropriate for parties to invoke the court's machinery to conduct the same kind of scrutiny of individual Board members' motivations through deposition discovery.

For now at least, inquiry into the individual motives of members of the defendant Board of Education in adopting the February 20, 1996 Policy is not part of this lawsuit. The parties should complete the remaining discovery in this case with that limitation clearly in mind.

For the foregoing reasons,

**IT IS ORDERED** that the discovery cutoff date is extended to **January 29, 1999**; the dispositive motion cutoff is extended to February 12, 1999; and the Final Pretrial Conference is hereby rescheduled for **April 16, 1999** at 9:30 a.m. and the prior setting on January 11, 1999 is hereby VACATED;

**IT IS FURTHER ORDERED** that discovery shall not be had through deposition by oral examination of past or present members of the Board of Education of the Salt Lake City School District pertaining to the motivation(s) of any member in connection with the Board's adoption on February 20, 1996 of its policy concerning student groups at district high schools.