The GAY GUARDIAN NEWSPAPER, and Ronald Marcus, as Editor and Chief of the Gay Guardian, Plaintiffs,

v.

OHOOPEE REGIONAL LIBRARY SYSTEM, et al., Defendants.

No. 6:02cv00104.

United States District Court, S.D. Georgia, Statesboro Division.

Nov. 19, 2002.

Gerald Weber, Elizabeth Lynn Littrell, American Civil Liberties Union of Georgia Foundation, Atlanta, GA, Elizabeth J. Norman, Pembroke, GA, for The Gay Guardian Newspaper, Ronald Marcus.

Catherine Harris Helms, Helms & Helms, PC, Homerville, GA, for Ohoopee Regional Board of Library Trustees.

Walter W. Ballew, III, Barrow & Ballew, PC, Savannah, GA, William T. Mitchell, Cruser & Mitchell, LLP, Norcross, GA, for Gail Edenfield.

J. Franklin Edenfield, Spivey, Carlton & Edenfield, Swainsboro, GA, for Dusty Gres.

## ORDER

EDENFIELD, District Judge.

### I. *INTRODUCTION*

In this case a publisher seeks 42 U.S.C. §§ 1983/1985–based damages and injunctive relief against a library alleged to have violated his First Amendment rights by removing his publication from its "free-literature" lobby table. Doc. ## 1, 3. The library and individual defendants deny liability and insist that plaintiff Ronald Marcus[1] is not entitled to injunctive relief. Doc. ## 18–20.

### II. *BACKGROUND*

None of the material facts are in dispute.[2] The Ohoopee Regional Library System[3] (the Library), permitted *The Gay Guardian* (a homosexual-rights advocating publication) to be distributed with other free publications on a front lobby table in its Vidalia–Toombs County, Georgia library. Doc. # 1 ¶ 20; # 20 at 1. After it received oral objections[4] to *The Gay*

---

1. Marcus, whose real name is Ronald Mangum, doc. # 4 at 2; # 5 (Mangum Aff.), joined his publication, *The Gay Guardian,* as co-plaintiff. For convenience, however, the Court will refer only to Marcus as the sole plaintiff here.

2. Hence, there is no need for an evidentiary hearing. *See Cumulus Media, Inc. v. Clear Channel Communications, Inc.,* 304 F.3d 1167, 1178 (11th Cir.2002) (Evidentiary hearing is required for entry of preliminary injunction only where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue).

3. The system "is a collection of real estate and personal property owned by the Ohoopee Regional Library System Board of Trustees." Doc. # 20 exh. 1 ¶ 3. It "is a multi-county system encompassing and serving the citizens of Toombs, Tattnall and Montgomery Counties in Georgia." *Id.* ¶ 2. These counties are located in South Georgia.

4. The Library has a written-objection procedure, doc. # 20 exh. 1 ¶ 13 ("Anyone who

*Guardian* in its lobby, doc. # 20 exh. 1 ¶¶ 14–15, the Library restricted the table to government and library-generated materials. Doc. # 1 ¶¶ 21–23; # 20 at 1–2 & exh.1 sub-exh. G; # 20 exh. 1 ¶ 17, exh. 2 ¶ 6.

The Library says it changed its policy "so that no [non-governmental] group, organization, or individual would be singled out or treated differently." Doc. # 20 exh. 2 ¶ 7. Marcus insists that the Library is unconstitutionally censoring *The Gay Guardian* even at the expense of squelching other, non-gay speakers. Doc. # 4 at 11–13. The Library concedes that it now carries no paper copies of *The Gay Guardian* but points out that it will assist patrons in finding it "online." Doc. # 1 ¶ 28; # 20 at 7 & exh. 1 ¶ 29.

This case therefore presents four issues: (1) whether librarians, in deciding on what a public (hence, government-run) library acquires/accepts and how it presents it, can exercise their own tastes and preferences, if not also take those of the local community into account, *see* doc. # 20 exh. 1 ¶ 19; *id.* sub-exh. A (the Library's 1/30/02 "Materials Selection Policy") *id.* ¶ IV ("Criteria for [library materials] Selection.... The needs and expressed requests of the community are analyzed as an aid to appropriate selection");

(2) whether librarians, after accepting books, publications, etc. (hereafter, "content") for their library's collection, may constitutionally reject or access-restrict same afterwards; [5]

complains about library materials (inclusion or exclusion) is offered a copy of the library's Materials Reconsideration request form to complete in order to request formal library review of the material"). No one invoked it here. *Id.* ¶¶ 14–15.

5. There is no dispute here that, because "public libraries are funded and controlled by state

(3) whether those who contribute content to a library's front lobby display table may enjoin the library's subsequent removal (outright or via transfer to a less-visible location) of it; and

(4) whether librarians can engage in a content-neutral forum closing (*i.e.*, remove all content from a disputed area of a library) solely to avoid disruption and litigation over issues (1)-(3), even assuming that viewpoint-discriminating censorship drives part or all of that decision.

Though the Court will touch on issues (1)-(3), it is only necessary to reach issue (4).

### III. ANALYSIS

#### A. First Amendment—The Big Picture

"The First Amendment provides that 'Congress shall make no law ... abridging the freedom of speech....' U.S. Const. amend. I. This prohibition on laws abridging the freedom of speech has been incorporated into the Fourteenth Amendment so that it also applies to state governments." *Weaver v. Bonner*, 309 F.3d 1312, 1318 (11th Cir.2002). The freedom is not absolute; some regulation (one cannot falsely shout "fire!" in a crowded theater, nor incite riots) has always been accepted.

"When an individual speaks, the government's ability to regulate that speech depends in some situations on the designation of the forum in which the individual chooses to speak." *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1009

and local governments, they are state actors, subject to the constraints of the First Amendment, as incorporated by the Due Process Clause of the Fourteenth Amendment." *American Library Ass'n, Inc. v. U.S.*, 201 F.Supp.2d 401, 451 n. 20 (E.D.Pa.2002), *probable jurisdiction noted*, —— U.S. ——, 123 S.Ct. 551, 154 L.Ed.2d 424 (2002).

(9th Cir.2000), *cert. denied*, 532 U.S. 994, 121 S.Ct. 1653, 149 L.Ed.2d 636 (2001).

When government regulation goes too far, the aggrieved speaker may ask a court to enjoin the regulator. *See, e.g., Prince v. Jacoby*, 303 F.3d 1074, 1090, 1094 (9th Cir.2002) (High school's restrictions on religious student group in denying equal access to student/staff time, school supplies, audio/visual equipment and school vehicles to convey group's messages, while providing such access to other student groups, lacked compelling government interest, and thus would violate group's free speech rights under First Amendment; school chose to create limited public forum in which student groups were free to utilize school amenities, and school's restrictions on equal access to its facilities were based purely on group's religious viewpoint). Marcus seeks that here.

> To be entitled to a preliminary injunction ... plaintiffs must demonstrate that (1) they have a substantial likelihood of success on the merits, (2) they will suffer irreparable injury unless the injunction issues, (3) the threatened injury to them outweighs the damage that the injunction would have on the opposing parties, and (4) if issued, the injunction would not disserve the public interest.

*This That and the Other Gift & Tobacco, Inc. v. Cobb County*, 285 F.3d 1319, 1321–22 (11th Cir.2002); *accord Johnson & Johnson Vision Care, Inc. v. 1–800 Contacts, Inc.*, 299 F.3d 1242, 1246–47 (11th Cir.2002).

### B. The Parties' Arguments

Marcus argues that the Library closed its "free-lit" lobby table forum in order to unconstitutionally censor unwanted (*The Gay Guardian*) speech. Doc. # 4 at 12–13. This, he concludes, violates his First Amendment and other constitutional rights, thus entitling him to preliminary injunctive relief reversing the forum-closure. *Id.*

The Library maintains that the government has the inherent right to control its property, and that includes the right to close any forum it creates. Doc. # 20 at 10. So whatever its reason here (it has conceded that it acted as it did after some members of the local community objected to placement of *The Gay Guardian* in its lobby), its actions violate no constitutional rights. *Id.*

### C. "The Desert"

The matter may be best considered by envisioning a tent in an intellectual desert. Various camels nose under it, but when an unwanted camel enters, some object. Told he can't exclude any camel, the tent operator simply folds the tent, thus barring all. When the unwanted camel complains, the operator replies that all are being treated equally, and besides, there are plenty of other tents in the desert.

For *The Gay Guardian* there are plenty of other tents, including the largest: The Internet.[6] No one can effectively control, much less close it. Yet within seconds personal computer users can find plenty of what long has been legally forbidden, even in many "free-speech" societies: porn with a core so hard that Congress has at least tried to keep under-aged library patrons from accessing it. *See* J. Krause, *Can Anyone Stop Internet Porn?* 88–SEP A.B.A. J. 56, 58 (2002) ("The 2000 Chil-

---

6. "The internet is used by more than 143 million Americans." *Malletier v. Veit*, 211 F.Supp.2d 567, 579 (E.D.Pa.2002). "At least 400 million people use the Internet worldwide, more than a quarter of them American." www.newsday.com/news/politics /wire/ sns-ap-scotus-porn-glance 1112nov12,0, 5021241 .story?coll= sns-ap-politics-headlines (site as of 11/19/02). *The Gay Guardian* issue attached as exhibit A to doc. # 1 claims that "over 17 Million people read *The Gay Guardian* online in 2001."

dren's Internet Protection Act required public libraries to use filters on their computers or risk losing federal funding").[7]

Still, few patrons would expect "XXX-rated," or even non-obscene yet explicitly erotic, magazines to be the first thing they or their children see when entering their community library's lobby. While *The Gay Guardian* cannot be equated with those publications, the driving question nevertheless remains: whether material to which some within a community might object can, without violating the First Amendment, be relocated to another location within that community's library, or even removed outright.

In other words, why can't community libraries cater to *community* taste?[8] And what right does an "unwanted-speech" speaker have to tell a librarian what to acquire and how to present it? Could swastika-bannered hate groups who had similarly exploited the Library's "free-lit" lobby table now similarly demand the same judicial relief? How about "swingers" or other pro-hedonism publications?

Finally, in a world where fanatical terrorism can spontaneously erupt virtually anywhere, why can't librarians, even while concurrently catering to majoritarian taste, consider potential civil-disturbance reactions when arranging materials within their library? *Cf. Texas v. Knights of the Ku Klux Klan*, 58 F.3d 1075, 1079 (5th Cir.1995) (affirming exclusion of the KKK from participation in Texas's adopt-a-highway program because of the potential for civil strife and interference with court orders); *but see Cuffley v. Mickes*, 208 F.3d 702, 709 (8th Cir.2000) (Evidence established that Missouri's purported reason for denying participation by the KKK in State's Adopt–A–Highway program—that the Klan had a history of unlawfully violent and criminal behavior—was merely a pretext for viewpoint discrimination; in fact, the State did not know how its regulation applied in practice, had never applied the regulation to anyone other than the KKK, and had never asked an applicant a single question about criminal history), *cert. denied*, 532 U.S. 903, 121 S.Ct. 1225, 149 L.Ed.2d 135 (2001).

Put another way, what business do judges have in second-guessing a librarian's content selection/arrangement? If the answer is none, or very little, does that change when librarians, as was the case here, create a limited open forum and, without subject-matter guidelines, invite outsiders to supply its content?

In other contexts government officials have permissibly adapted *non* public forums (like government building lobbies not otherwise aimed at facilitating free expression) to avoid controversy. *See, e.g., Sefick v. U.S.*, 1999 WL 778588 at * 11–12 (N.D.Ill.May 6, 1999) (unpublished) (in rejecting artistic display in lobby of government building, General Services Adminis-

7. *See also American Library Ass'n*, 201 F.Supp.2d at 479 (Children's Internet Protection Act, which required public libraries to use Internet filters as condition for receipt of federal subsidies, unconstitutionally induced libraries to violate First Amendment; although government had compelling interest in preventing dissemination of obscenity, child pornography and material harmful to minors, and in preventing library patrons from being unwillingly exposed to such material, software's inherent over-and under-inclusiveness meant that statute was not narrowly tailored, and libraries had less restrictive alternative means at their disposal).

8. *See American Library Ass'n*, 201 F.Supp.2d at 421 ("Public libraries generally make material selection decisions and frame policies governing collection development at the local level"); *id.* (explaining that "collection policies are often drawn up in conjunction with the libraries' governing boards and *with representatives from the community*, and may be the result of public hearings, discussions and other input") (emphasis added).

tration (GSA) could, consistent with the First Amendment, consider display's disruptive impact on its tenants).

*Sefick* and cases like it, however, did not involve what's known as a limited or designated public forum aimed at (sometimes just temporarily) facilitating free speech. In one such forum an analogous dispute arose and the court there held that an unrestricted (subject-matter-wise) government program aimed at displaying publicly contributed art can violate the First Amendment if government officials selectively exclude "undesireable" contributions. *Hopper v. City of Pasco,* 241 F.3d 1067, 1080–82 (9th Cir.) (city's alleged policy, in opening city hall for display of works by local artists, not to accept any "controversial" works, was insufficient to prevent city hall from becoming "designated public forum," from which artwork could be excluded only when necessary to serve compelling state interest, and the mere possibility that children might pass through the area where artwork was to have been displayed was not "compelling" reason for excluding it), *cert. denied,* —— U.S. ——, 122 S.Ct. 346, 151 L.Ed.2d 261 (2001); *see also People for the Ethical Treatment of Animals v. Gittens,* 215 F.Supp.2d 120, 129 (D.D.C.2002).

## D. Different Forums, Different Rules

The above-cited cases reflect different rules for different forums. There are basically three types of forums: (1) the traditional public forum (*e.g.,* the village green);[9] (2) the limited or designated public forum[10] (where the government has designated, sometimes just for a limited time, space open for limited expressive activity); and (3) the nonpublic forum (*e.g.,* a courthouse lobby), which involves public property not aimed at free expression.[11] *See Heartbeat of Ottawa County, Inc. v. City of Port Clinton,* 207 F.Supp.2d 699, 701–02 (N.D.Ohio 2002).

Courts apply the highest scrutiny to government content control of the "traditional" public forum and increasingly less to limited, then nonpublic, forum cases. *Id.; accord Gay Lesbian Bisexual Alliance v. Pryor,* 110 F.3d 1543, 1548 (11th Cir.1997) (the government's power to limit speech is weakest in traditional public forums such as streets and parks; but its power to regulate speech is strongest in

9. Streets, parks, sidewalks (etc.) are places which, by long tradition or by government fiat, have been devoted to assembly and debate. These traditional public forums exist regardless of the government's intent to create or not to create a forum for speech. *Sons of Confederate Veterans, Inc. v. Commissioner of the Virginia Department of Motor Vehicles,* 288 F.3d 610, 622–23 (4th Cir.2002).

10. *See Sons of Confederate Veterans,* 288 F.3d at 622–23 (a designated public forum, whether limited or unlimited in scope, is one a State creates by intentionally opening a nontraditional forum for public discourse, and government may confine a limited forum to the limited and legitimate purposes for which it was created by reserving it for certain groups or for the discussion of certain topics).

11. *See Sons of Confederate Veterans,* 288 F.3d at 622–23 (in a nonpublic forum, the government reserves eligibility for access to it, typically to a particular class of speakers, whose members must obtain permission to use it); *Cahill v. Texas Workforce Comm'n,* 198 F.Supp.2d 832, 835 (E.D.Tex.2002) (State's policy of limiting information that could be put on bulletin board and other media used by state workforce commission for job postings, specifically denying former employee's request to post his opinion of former employers, was reasonable and viewpoint neutral within meaning of First and Fourteenth Amendment, where forum was intended to match job seekers with employers and allowing former employees to post their opinions about former employers could disrupt forum and detract from its intended use), *aff'd,* Slip. Op.No. 02–40462 (5th Cir.9/20/02) (unpublished).

nonpublic forums such as military bases and prisons). Thus,

> [i]n either a traditional or designated public forum, the government may regulate speech through reasonable restrictions on time, place, and manner (e.g., no electric bullhorns after 9 p.m. in residential areas), but it may regulate expressive content only if the restriction is necessary and narrowly drawn to advance a compelling state interest.

*Sefick,* 1999 WL 778588 at * 9; *American Library Ass'n,* 201 F.Supp.2d at 461 (Where State designates forum for expressive activity and opens forum for speech by public at large on wide range of topics, strict scrutiny applies to restrictions that single out for exclusion from forum particular speech whose content is disfavored).

### E. Libraries Are Limited Public Forums

■ The parties here agree that a public library clearly is a limited public forum. *See, e.g., Kreimer v. Bureau of Police,* 958 F.2d 1242, 1257 (3rd Cir. 1992). As a limited public forum, "the Library is obligated to permit the public to exercise rights that are consistent with the nature of the Library and consistent with the government's intent in designating the Library as a public forum," but "[o]ther activities need not be tolerated." *Id.* at 1262. Indeed, a library need not be open "for the exercise of all First Amendment activities merely because [it is open] for the exercise of certain specified First Amendment activities." *Id.* at 1262 n. 21.

*Neinast v. Bd. of Trustees of Columbus Metropolitan Library,* 190 F.Supp.2d 1040, 1043–44 (S.D.Ohio 2002); *see also Armstrong v. District of Columbia Public Library,* 154 F.Supp.2d 67, 75 (D.D.C.2001); *id.* at 79 (Public library regulation authorizing personnel to deny access to patrons based on "objectionable" appearance, including "barefooted, bare-chested, body

odor, filthy clothing, etc.," was overbroad under First Amendment; term "etc." and discretion accompanying its interpretation created standardless test placing patrons' rights of access to ideas and information in realistic danger).

■ In public libraries, then, [c]ontent-neutral "time, place, or manner regulations that limit permitted First Amendment activities within a designated public forum are constitutional only if they are 'narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels of information.'" *Kreimer,* 958 F.2d at 1262 (*quoting Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). And "the requirement of narrow tailoring is satisfied 'so long as . . . the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward,* 491 U.S. at 799, 109 S.Ct. 2746 (*quoting United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)); *see also Turner Broadcasting System, Inc. v. F.C.C.,* 520 U.S. 180, 189, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (subject to intermediate scrutiny, a "content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests").

*Neinast,* 190 F.Supp.2d at 1044.

■ These parameters preserve "our profound national commitment to the free exchange of ideas," *Ashcroft v. Am. Civil Liberties Union,* 535 U.S. 564, 122 S.Ct. 1700, 1707, 152 L.Ed.2d 771 (2002) (quotes, cite and brackets omitted), including "ugly" ones. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,* 457 U.S. 853, 872, 102 S.Ct. 2799, 73

L.Ed.2d 435 (1982) (plurality) (a local school board could not remove books from the school library solely because the members of the board disliked the ideas contained therein); *Sund v. City of Wichita Falls,* 121 F.Supp.2d 530, 547 (N.D.Tex. 2000) (Resolution by city council, which gave 300 library card holders the right to censor books on the subject of children with gay and lesbian parents by having the books removed from children's area of library to adult section, violated library patrons' First Amendment rights to receive information; resolution was enacted specifically for the purpose of suppressing specific books, placed significant burden on patrons' ability to gain access to those books, was vague, created a risk of arbitrary and discriminatory application, and failed to provide adequate means for timely review and appeal of book removal decisions);[12] *Pfeifer v. City of West Allis,* 91 F.Supp.2d 1253, 1261–62 (E.D.Wis.2000) (City's refusal to allow plaintiff to use a meeting room in public library to present a program on creationism violated his rights under the First and Fourteenth Amendments; room was a designated public forum, and exclusion of plaintiff based on his religious message was a content-based restriction unsupported by a compelling state interest).

## F. The Hybrid–Forum Factor

As noted above, a public building's front lobby is typically considered a *non* public forum, which means that government officials who operate those buildings have a much freer reign, for example, in selecting what sort of "invited" public art can go in them. *Sefick,* for example, involved a government building lobby (hence, a non-public forum, 1999 WL 778588 at * 1, 8) where the government limited invited lobby art to that which suited its building tenants' tastes; it simply did not set up an artistic-expression forum. *Id.* at * 11–12 ("If GSA officials may decide that a display is not appropriate for the courthouse lobby because it is not in keeping with a reasonably dignified atmosphere, they should be able to make similar judgments for buildings housing the executive or legislative branches").

In that respect, not all nonpublic forums are buildings. The above-cited Texas "KKK" case involved a highway program deemed a non-public forum. In other words, the program was designed to encourage public highway trash removal, not provide a free-speech forum. *Texas,* 58 F.3d at 1079. The State therefore could cite controversy-avoidance in excluding the KKK there. *Id.* at 1079–81.

Still, some of the distinctions applied in this sphere are elusive,[13] and that can naturally cause uncertainty among library officials charged with harmoniously operating a *community* library. Such librarians are entitled to be concerned with the fact that the library's lobby is the first thing the community sees.

In arranging the tone and texture of a library's lobby, then, it would not be outlandish for librarians to be influenced by the same concerns flowing through non-

---

**12.** *See also Sund,* 121 F.Supp.2d at 547 ("The right to receive information is vigorously enforced in the context of a public library...."). Plaintiff Marcus is advancing a "right to distribute," not a "right to receive" claim here.

**13.** As the *Sefick* court noted,
[t]he prohibition on viewpoint discrimination can be difficult to apply. The Supreme Court has made it clear in its "forum" cases that the government may regulate the "subject matter" of speech in a nonpublic forum but may not regulate based on "viewpoint." The Seventh Circuit has described the line between "subjects" and "viewpoint" as "elusive."
*Sefick,* 1999 WL 778588 at *10; *see also Giebel v. Sylvester,* 244 F.3d 1182, 1188 n. 10 (9th Cir.2001).

public forum cases which, like *Texas* and *Sefick,* sanction the use of "controversy-avoidance" measures. *See also American Council of the Blind v. Boorstin,* 644 F.Supp. 811, 816 (D.D.C.1986) ("The desire to evade controversy generally qualifies as a legitimate rational basis under nonpublic forum analysis").

In responding to the local community's reaction to its lobby, a library might, just as government building operators can do, rationally distinguish between its interior meeting rooms and its front lobby, which is the building's "first greeting" to the public. Public/private building owners do likewise when deciding to invest more aesthetic resources into their building's lobby than its interior hallways and other areas. In many lobbies, art and other forms of expression are simply "mainstreamed," or at least "defanged."

A library might want to treat its front lobby different from other areas for the simple reason that most patrons enter through the lobby and thus are a captive audience. The captive-audience factor figures into non-public forum cases. *See, e.g., Texas,* 58 F.3d at 1080 (noting, as a factor the State could permissibly consider, the fact that nearby housing project residents would have no way of avoiding the KKK's adopt-a-highway sign).

So even when a library decides to facilitate free expression in its front lobby (thus making it a limited public forum), it nevertheless does so within an area that also arguably remains a nonpublic forum to the extent that it serves to greet a captive-audience public and engender the quiet atmosphere that the library would like to present. It is in that sense that the Library's lobby may be considered a hybrid—a cross between a limited and a nonpublic forum.

Here it is undisputed that the Library specially created and absorbed the cost of the temporary, "lobby-table forum" (*i.e.,* it supplied the table and, of course, the space around it) on which *The Gay Guardian* and other free publications were placed. It also is undisputed that the Library placed the table in its *lobby* and, as was the case with the tenants in *Sefick,* that's the first thing virtually all of its patrons see.

To some extent, then, it seems reasonable to allow those distinguishing factors (*i.e.* building aesthetics, etc.) to figure into the Library's forum-management (which would include, at a minimum, closure) considerations. Consider the Seventh Circuit's *Sefick* rationale with respect to the lobby of a well-known courthouse:

> Nothing in the first amendment prevents the government from allowing sedate and decorous exhibits—the lobby of the Dirksen Courthouse contains the Great Seal of the United States, copies of the Constitution and Declaration of Independence, a memorial to a deputy marshal killed in the line of duty, and a bust of Senator Dirksen—while excluding the comic, the caustic, and the acerbic.... A preference for the somber over the sardonic within a courthouse is not viewpoint or even subject matter discrimination. It is a standard time, place, and manner limitation.

*Sefick v. Gardner,* 164 F.3d 370, 373 (7th Cir.1998).

Here the Library grants access to *The Gay Guardian* and, by definition, all other speech ugly and beautiful—*elsewhere* in the Library.[14] It can be said to be uni-

---

**14.** The Court will not consider the Internet versus paper-copy distinctions raised in plaintiff's *reply* brief. Doc. # 21 at 7. He not only raises this issue for the first time, *after* defendants responded on the merits, but also in violation of S.D.Loc.R. 7.1 ("Every factual assertion in a motion, response, or brief shall be supported by a citation to the pertinent page in the existing record or in any affidavit,

formly removing all private speech from its lobby for, *inter alia,* "decorum" purposes (*i.e.,* avoiding loud, garish, prurient materials thought by most to be incompatible with the invitingly quiet atmosphere most libraries seek to project).

A sense of decorum may include a simple wish to avoid the putative disruption and resulting emotional/legal headaches that some "free-lit" materials reasonably could be supposed to engender. Few would want their 12–year–old son to ride his bike to the community library and encounter a "NAMBLA pamphlet"[15] in its lobby. And few would expect librarians, having meandered into setting up a "free-lit" lobby table and all the legal headaches a seemingly innocuous move such as that might produce, to have to spend their days fending off the putative majoritarian outcry after "little Tommy" brings a NAMBLA pamphlet home to mom and pop.

Given the judicial latitude granted to government building owners in managing the presentation of their front lobbies, then, some importation of the non-public forum case rationale is warranted here. But even in nonpublic forum cases, naked viewpoint-discrimination is prohibited. *Boorstin,* 644 F.Supp. at 816–17 (decision by Librarian of Congress to bow to congressional, stop-subsidization threats by discontinuing distribution of braille *Playboy* magazine because of its "sexual orientation" was impermissibly viewpoint-based).[16]

To that end, Librarians may ordinarily take some comfort in the fact that, even when viewed solely as a limited public forum, their content selection/removal decisions need only have a rational basis:

> [G]enerally the First Amendment subjects libraries' content-based decisions about which print materials to acquire for their collections to only rational review. In making these decisions, public libraries are generally free to adopt collection development criteria that reflect not simply patrons' demand for certain material, but also the library's evaluation of the material's quality. *See.* Bernard W. Bell, *Filth, Filtering, and the First Amendment: Ruminations on Public Libraries' Use of Internet Filtering Software,* 53 Fed. Comm. L.J. 191, 225 (2001) ("Librarians should have the discretion to decide that the library is committed to intellectual inquiry, not to the satisfaction of the full range of human desires.").

*American Library Ass'n,* 201 F.Supp.2d at 462.

> "Thus," that court concluded,
> a public library's decision to use the last $100 of its budget to purchase the complete works of Shakespeare even though more of its patrons would prefer the library to use the same amount to purchase the complete works of John Grisham, is not, in our view, subject to strict scrutiny. *Cf. NEA v. Finley,* 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500

discovery material, or other evidence filed with the motion"). In other words, his evidentially unsupported factual assertions constitute only "lawyer speak." Plaintiff otherwise is not arguing that the Library's failure to stock any paper copies of *The Gay Guardian* elsewhere in the Library establishes a constitutional violation of some sort. *See* doc. # 4 at 9.

**15.** See www.nambla1.de/welcome.htm ("The North American Man/Boy Love Association

(NAMBLA) was formed in 1978.... Our membership is open to everyone sympathetic to man/boy love and personal freedom") (site as of 11/19/02).

**16.** The braille-literature program in *Boorstin,* incidentally, qualified as a "nonpublic forum," as opposed to a "limited public forum," because it involved a "government-sponsored means of communicating to a specific group of private individuals...." 644 F.Supp. at 815.

(1998) (subjecting only to rational basis review the government's decision to award NEA grants on the basis of, *inter alia*, artistic excellence).

*Id.*

Similar deference, by the way, is shown to *viewpoint-neutral* library acquisition/selection decisions. *See Via v. Richmond*, 543 F.Supp. 382, 384 (E.D.Va.1982) (Refusal by city public library to accept and display gift subscription to atheist magazine did not violate First Amendment rights of director of local chapter of society publishing the magazine where librarian's decision was based upon judgment that publication was of low quality, that there was little or no indication of interest by reading public, and that subject matter was dealt with by better quality publications and books, and there was no showing that the subscription offer was refused because the library did not want to display magazine espousing cause of atheism).[17]

To that end, this rationale has been somewhat stretched. *See Bicknell v. Vergennes Union High School Bd. of Directors*, 638 F.2d 438, 441 (2d Cir.1980) (plurality) (There was no First Amendment violation by school board's removing two books from school library on basis of vulgarity and indecency of language where there was no suggestion that the books were removed because of their ideas or because board members acted out of political motivation or any claim that the passages found objectionable were beyond the allowable scope accorded school authorities to regulate vulgarity and explicit sexual content, notwithstanding claim that board members applied their own standards of taste about vulgarity).

Note also that when the government itself speaks, it need not include, much less consider, all other viewpoints. *See Wells v. City and County of Denver*, 257 F.3d 1132, 1143–44 (10th Cir.) (First Amendment did not require city to include, along with its holiday display on steps of city building of such things as creche, snowman figures, and sign listing corporate sponsors, "Winter Solstice" sign presented by foundation advocating freedom from religion, which sign stated that no gods existed, where there was no evidence that sign was excluded for viewpoint-related reasons; Director of Public Office Buildings testified that he had also denied request for permission to add menorah to display), *cert. denied,* —— U.S. ——, 122 S.Ct. 469, 151 L.Ed.2d 384 (2001); *Downs*, 228 F.3d at 1011 (Bulletin board in public high school on which materials relating to school's gay and lesbian awareness month were posted constituted speech attributable to school district and school board, through enforcement of district and board policy by school principal, rather than individual speech that was sponsored by school or had received its imprimatur, as would require viewpoint neutrality on part of school in allowing postings under First Amendment, and thus teacher who sought

---

**17.** *Compare Case v. Unified Sch. Dist. No. 233*, 908 F.Supp. 864, 874–75 (D.Kan.1995) (Majority of school board violated junior and senior high school students' rights, under First Amendment and corresponding state constitutional provision, by ordering removal from library shelves of novel depicting fictional romantic relationship between two teenage girls; while majority characterized book as "educationally unsuitable," it was apparent from their trial testimony that removal was based on "members' personal disapproval of the ideas contained in the book," novel had been removed without regard to policy for reviewing objectionable material, and there had been no discussion of less restrictive limitations on access to novel), cited in Ann., *Propriety, under First Amendment, of school board's censorship of public school libraries or coursebooks*, 64 A.L.R. Fed. 771 § 4a (1983); *see also Case v. Unified School Dist. No. 233, Johnson County, Kan.*, 895 F.Supp. 1463, 1469–70 (D.Kan.1995) (collecting cases).

to post materials reflecting differing viewpoint had no First Amendment right to dictate or contribute to speech contained on bulletin board); *Charter v. U.S. Dept. of Agr.,* 230 F.Supp.2d 1121, 1138–1139 (D.Mont.2002).

The instant case involves no government speech but the dissemination of literature within a limited government (but *non-school*) library forum (the Library's "free-lit" lobby table), one best viewed as a hybrid (*i.e.,* limited *and* non-public) forum. It also involves, plaintiff contends, the elimination of unwanted (gay publication) speech—the essence of viewpoint discrimination.

## G. Closing The Forum

The Library does not challenge plaintiff's contention that, had it kept its lobby table open and excluded only *The Gay Guardian,* it would violate the First Amendment. *See Hopper,* 241 F.3d at 1080–82; *Prince,* 303 F.3d at 1094; *Sund,* 121 F.Supp.2d at 549–50; *see also* www.ala.org/alaorg/oif/genderorsex.pdf (American Library Association site as of 11/19/02). Can it escape judicial second-guessing, and thus costly litigation, by partially closing (*i.e.,* to all private, as opposed to government, speakers) the forum itself?

Certainly that presents a lower-cost approach than fending off present and reasonably anticipatable disruption[18] (including the attendant litigation risks) over content-selection/rejection decisions, for even under a deferential "rational review" standard, the removal of "disturbing" or "indecent" materials invites lengthy debate. It's been emphasized, for example, that

[w]here the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists. We are expected to protect our own sensibilities "simply by averting [our] eyes."

*U.S. v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). Yet

[i]n a wide range of contexts, governments are operating "public sensibilities forums." That is, governments are granting speech opportunities to private citizens and groups, but are limiting access to speech that is, in one way or another, consistent with, rather than offensive to, public sensibilities. This type of standard creates the possibility that the people who administer the forum will engage in unconstitutional viewpoint discrimination. At the same time, these government/private speech interactions are acts of largesse, not regulation, and are often highly publicly visible. These considerations suggest that the government, and the public it serves, should not have to tolerate the same range of "outrageous" speech that they must when the government does not provide the speech opportunity.

L.G.Jacobs, *The Public Sensibilities Forum,* 95 Nw.U.L.Rev. 1357, 1435–36 (2001). Rather than straddle these two points, the Library here would simply like to fold its tent (close down the very forum that it created).

Can it constitutionally do that? In somewhat analogous contexts, courts have accorded local governments some legal

---

18. *See* doc. # 20 exh. 1 ¶ 11 ("an unidentified woman was observed by library staff picking up [from the lobby table] the remaining copies of *The Gay Guardian* … and then leaving"); doc. # 5 (audio tape revealing Marcus's complaint to local police that the Library was destroying his "private property"); doc. # 20 exh. 1 ¶ 14 (the Library received oral complaints about *The Gay Guardian's* presence in its lobby).

breathing space. *See Rhames v. City of Biddeford*, 204 F.Supp.2d 45, 53–54 (D.Me. 2002) (Assuming that municipality's temporary shutdown of public access television station, while access procedures were studied, was restriction on use of designated public forum, provider of programming seeking temporary restraining order requiring resumption of programming failed to establish likelihood of succeeding on merits of claim that shutdown violated his First Amendment rights; shutdown appeared narrowly tailored to satisfy compelling government interest in avoiding costs of litigation associated with present access procedures); *Sefick*, 1999 WL 778588 at * 11–12.

In deciding how much "breathing space" to afford, courts focus on the nature of the forum that local government creates. *See Pryor*, 110 F.3d at 1547 ("The government's power to restrict First Amendment activities depends on the nature of the relevant forum") (quotes and cite omitted); *Wells*, 257 F.3d at 1144 (The characterization of Government property as a traditional public forum, a designated public forum, or a non-public forum is necessary in a free speech action to determine the extent to which the Government may limit access to the property, that is, whether a heightened or reasonableness standard applies).

It is undisputed, however, that if the Library engaged in censorship here, it did so not "directly," as did the governments in *Sons of Confederate Veterans*,[19] *Pryor*, etc., but rather indirectly, via forum closure. Does that violate the First Amendment? Courts have concluded that

> "[b]asic First Amendment principles do not prevent a city from closing or selling a [public forum]." *Rhames v. City of Biddeford*, 204 F.Supp.2d 45, 50 (D.Me. 2002); *Intl' Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 699–700, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (Kennedy, J. concurring). "Likewise, the First Amendment does not prevent a city from deciding not to open a public access channel in the first place or to close it later." *Id.*

*Philadelphia Community Access Coalition v. Street*, 2002 WL 1611542 at * 4 (E.D.Pa. July 23, 2002) (unpublished) (Even if public forum was created by city ordinance, requiring establishment of public access corporation, which would oversee development of public access cable television channels in city, actions of city and its officials of not complying with ordinance, which were akin to closing down public forum, did not support First Amendment claim; basic First Amendment principles did not prevent city from closing or selling public forum, nor did the First Amendment prevent city from deciding not to open public access channel in first place or to close it later).

Still, in *Street* no one alleged that the defendant government officials acted "upon a desire to regulate the content of speech," 2002 WL 1611542 at * 4, while that's precisely what Marcus alleges here. Doc. # 4 at 5. Indeed, he also insists that defendants are engaging in prior restraint

---

**19.** There the Fourth Circuit held that Virginia could not, consistent with the First Amendment, squelch one speaker's views while allowing others' in the "special license plate" limited forum that it created. 288 F.3d at 626 (State statute that authorized issuance of special license plates to members of organization of descendants of Confederate army veterans, but prohibited display of organization logo incorporating Confederate flag, constituted viewpoint discrimination that could not withstand strict scrutiny, and thus violated First Amendment, given nature of restricted speech, lack of generally applicable content-based restriction, breadth of state's special plate program, and lack of any restrictions in statutes authorizing special plates other than organization's plates).

in violation of his Georgia constitutional rights. *Id.* at 5 n. 1.

Moreover, the Library admits that it closed its "lobby forum" because it simply did not want to deal with potential disruptions caused by *The Gay Guardian's* distribution in its front lobby (*e.g.*, an anti-gay patron comes along and clears out all of *The Gay Guardian* copies, causing pro-gay patrons to wrongly suspect or accuse library staff of engaging in crude censorship or worse; violent "straights" could lurk about waiting to "straighten-out" patrons who browse free copies of *The Gay Guardian;* litigation risks and attendant insurance liability premiums escalate accordingly). Plaintiff insists there's some evidence of religiously driven, anti-gay bias. *See* doc. #5, R. Mangum Aff. ¶8 (defendant Gress "said the papers were removed because of 'a religious issue, gays versus Christians....' "). Defendants deny this. Doc. #20 exh. 1, 3.

For argument's sake assume the worst here—that an impermissibly censorious motive figured into the Library's forum closing. Is that legally relevant? Absent any evidence that a facially neutral closure (or partial closure) policy bears the *effect* (in contrast to intent)· of singling out an "unwanted" speaker, this Court holds that it is not. *See Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 116, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) ("our cases have consistently held that illicit ... intent is not the sine qua non of a violation of the First Amendment") (quotes and cite omitted); *cf. Grossbaum v. Indianapolis–Marion County Bldg. Auth.*, 100 F.3d 1287, 1290 (7th Cir.1996) (closing a forum to all displays to avoid displaying a religious symbol was not unconstitutional; "we hold that the motive of a government body is irrelevant when it enacts a content-neutral rule that regulates speech in a nonpublic forum....").[20]

But *Simon & Schuster* involved no public-forum analysis, and *Grossbaum* (and the prior cited cases like it) involved a nonpublic forum, while here a hybrid limited/non-public forum is involved. *See* doc. #20 at 9. Even so, good public policy reasons exist for allowing a governmental body to close a hybrid forum such as this in a speech-suppressive manner to avoid reasonably anticipatable disruption and attendant litigation. *Cf. Grossbaum*, 100 F.3d at 1295 (Courts will not sustain claim that government has taken action in retaliation for plaintiff's assertion of his or her rights where plaintiff challenges only en-

---

**20.** As that court explained:
A number of factors explain this reluctance to probe the motives of legislators and administrators. For starters, the text of the Constitution prohibits many government actions but makes no mention of governmental mentes reae (i.e., guilty minds). The First Amendment, for example, forbids Congress and (through the Fourteenth Amendment's Due Process Clause) the States from making laws "abridging the freedom of speech"—a far different proposition than prohibiting the intent to abridge such freedom. We are governed by laws, not by the intentions of legislators. Just as we would never uphold a law with unconstitutional effect because its enactors were benignly motivated, an illicit intent behind an otherwise valid government action indicates nothing more than a failed attempt to violate the Constitution.
*Grossbaum*, 100 F.3d at 1292 (quotes and cites omitted). There are exceptions to this "reluctance," *see Cinamerica Theatres, L.P. v. City of Boulder*, 50 P.3d 921, 926 (Colo.App. 2002) (When a tax that burdens First Amendment rights is generally applicable and content neutral on its face, it will not be subjected to strict scrutiny unless there is evidence of a legislative interest in censoring the expressive activities of the taxed speaker or evidence that the tax is likely to stifle the free exchange of ideas); *Hopper*, 241 F.3d at 1075 (courts focus on what *type* of forum government *intended* to create), but none apply here.

actment of prospective, generally applicable rule, as executive and legislative branches of government must not be paralyzed by prospect of retaliation claim, and attendant fact-based motive inquiry, whenever they make new policy that is arguably in response to someone's speech or lawsuit); *Grossbaum v. Indianapolis–Marion County Building Authority*, 909 F.Supp. 1187, 1209–12 (S.D.Ind.1995) ("Under these circumstances, it is not unreasonable for managers of public property to retreat to the safest harbor they can find, which is to close the forum, as these defendants have done. These defendants' obvious desire to avoid controversy and to focus their energy and resources on their primary mission rather than umpiring access to a nonpublic forum is a constitutional motivation and not a pretext for any illicit motive here").

Here, for example, the Library's forum-closing reaction would undoubtedly be the same had publishers of, for example, erotic but not obscene literature dropped free copies on its "free-lit" library table. And many patrons no doubt would object to swastika-laden hate literature, etc. Rather than fight on the merits, the Library has opted for a low-cost, conflict-avoiding maneuver. One court expounded at some length on this tactic in the nonpublic forum context:

> Faced with a choice between possible First Amendment litigation regarding denial of access to an open forum for some persons and the ability to close the nonpublic forum completely, many prudent property managers may be expected to choose the legally safe harbor of closing the nonpublic forum altogether. *See* [*Arkansas Educational Television Comm'n v. Forbes*, 523 U.S. 666, 681–82, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) ]

(noting that Nebraska Educational Television Network canceled a debate between U.S. Senate candidates rather than face potential First Amendment liability for failing to include all candidates who might appear on the ballot); *Sefick v. Gardner*, 164 F.3d at 372 ("the GSA decided that for security and aesthetic reasons it will not authorize displays of any kind in the lobby of the Dirksen Courthouse. Today the nature and message of a sculpture is irrelevant; none will be displayed."); *Grossbaum*, 909 F.Supp. 1187, 1202 (S.D.Ind.1995), *aff'd*, 100 F.3d 1287 (7th Cir.1996) (upholding manager of Indianapolis' City–County building's decision to respond to previous loss in the courts by changing policy to prohibit all displays "by any nongovernmental, private group or individual").

*Sefick*, 1999 WL 778588 at * 15.

In that regard, judicial reluctance to wade into "motivation waters" is nothing new. *Palmer v. Thompson*, 403 U.S. 217, 227, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971) (City of Jackson, Mississippi could close down its public swimming pools rather than desegregate them), though an equal protection case, has never been formally overruled. *See also id.* at 228, 91 S.Ct. 1940 (concurrence) ("[A]ll that is good is not commanded by the Constitution and all that is bad is not forbidden by it. We would do a grave disservice, both to elected officials and to the public, were we to require that every decision of local governments to terminate a desirable service be subjected to a microscopic scrutiny for forbidden motives rendering the decision unconstitutional"),[21] quoted in *Rhames*, 204 F.Supp.2d at 50 n. 4.

---

**21.** While the Eleventh Circuit *would* consider motivation in Establishment Clause cases, *see Church of Scientology Flag Service Organiza-* *tion, Inc. v. City of Clearwater*, 2 F.3d 1514, 1528 (11th Cir.1993), plaintiff has not raised such a claim here.

Each State and local governmental entity must be afforded breathing space when faced with the cost of disruption and/or ensuing litigation over whether to continue with the limited public forum that it creates. Indeed, courts have expressly sanctioned forum closures as a conflict-avoiding measure. *See Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 783, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (Eight members of the Court joined behind the proposition that the State of Ohio "could ban all unattended private displays in [the forum] if it so desired"); *Chabad–Lubavitch of Georgia v. Miller,* 5 F.3d 1383, 1394 (11th Cir.1993) (en banc) ("If Georgia fears that it would violate the Establishment Clause by allowing [a religious] display [in its State capitol rotunda], it can avoid the perception that it is endorsing a religion by ... closing the forum altogether...."); *DiLoreto v. Downey Unified School Dist. Bd. of Educ.,* 196 F.3d 958, 966–67 (9th Cir.1999) (High school's baseball field fence was a "nonpublic forum" open for a limited purpose, and the district could exclude subjects from posting thereon that would be disruptive to the educational purpose of the school; the school sold advertising space on the fence to defray athletic program expenses, but excluded certain subjects from the advertising forum as sensitive or too controversial for the forum's high school context, and there was no evidence in the record that any political, religious, or controversial public issue advertising was ever permitted on the fence); *id.* at 970 ("the fact that [the school district] chose to close the forum rather than post Mr. DiLoreto's advertisement does not constitute viewpoint discrimination").

And nothing in *Perry Education Assoc. v. Perry Local Educators' Assoc.,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), which addressed and sanctioned content-discriminating, selective access to a government-created communications channel, indicates that outright forum closure (as is the case here, at least with respect to all non-governmental literature) is constitutionally impermissible. *Id.* at 46, 103 S.Ct. 948 ("Although a state is *not required* to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum") (emphasis added); *see also Initiative and Referendum Institute v. U.S. Postal Service,* 116 F.Supp.2d 65, 74–75 (D.D.C.2000) (Regulation barring solicitation of signatures for petitions, polls and surveys on exterior post office properties—thus closing that forum to private speakers—was content-neutral, for First Amendment purposes, even though regulation did not prohibit voter registration).

Because the Library's forum closing equally affects both gay and non-gay interests—including Sons of Confederate veterans who might also wish to distribute their own free literature—the Court concludes that plaintiffs likely will not prevail on the merits of their First Amendment claim, which is a prerequisite to obtaining injunctive relief. *Cf. Grossbaum,* 100 F.3d at 1295–96 (Retaliation claims which are asserted by plaintiffs who allege that government has unconstitutionally acted in response to plaintiffs' assertion of rights protect constitutional rights only against their unequal infringement; doctrine protects citizens against those individualized, discretionary government actions where government's coercive power is greatest, and not against government rules that affect both majority and minority alike); *Palmer,* 403 U.S. at 224, 91 S.Ct. 1940 (That city was allegedly motivated by a desire to avoid integration in closing of public swimming pools would not of itself constitute violation of equal protection in absence of state action affecting blacks differently from whites).

A couple of cases nevertheless merit special mention here. The Court finds easily distinguishable *ACT–UP v. Walp*, 755 F.Supp. 1281, 1289–90 (M.D.Pa.1991) (Closing of gallery of Pennsylvania House of Representatives during governor's speech was content-based restriction on speech, where gallery was closed with aim to prevent access to members of organization devoted to raising public awareness of AIDS crises), on which plaintiff heavily relies. Doc. # 4 at 12–13.

First, few could imagine a more suitable forum than a State legislature for the enthusiastic expression of political viewpoints—subject to reasonable time, place and manner regulations. Libraries, in contrast, are by nature heavily regulated (loud, physically disruptive patrons can be ejected, *see ACT–UP*, 755 F.Supp. at 1289 n. 6) to enable the traditional library atmosphere of quiet study, not boisterous idea-transmission. Again, the nature of the forum in no small part drives the analysis here.

Second, the speech sought to be advanced in *ACT–UP* involved the petitioning of one's government in a forum where citizen-representative interaction traditionally occurs. Other groups had been permitted in the legislative gallery in question, and the State admitted that it had singled out the plaintiff organization for exclusion. 755 F.Supp. at 1289.

Also, the State had failed to employ less restrictive means to prevent disruption (*e.g.,* simply post some police to immediately remove those who violated the chamber's decorum). *Id.* at 1290. In contrast, no such citizen-representative interaction existed in the instant case forum. The Library's forum-closing affects all private groups equally, and plaintiff has pointed to no less restrictive means.

Furthermore, libraries passively serve up information and quietly disseminate competing ideas. They have not been the first place to which those who stand on soap boxes resort when seeking political support. That courts have made distinctions based on the character of the forum in which speech is expressed is nothing new. *See, e.g., Knight v. Anderson*, 480 F.2d 8, 10 (9th Cir.1973) ("Not every parcel of publicly owned property is a suitable or available place for the exercise of the constitutional rights of citizens to petition their government or express grievances"), cited in 16B C.J.S. CONSTITUTIONAL LAW § 556 (*Publicly Owned Property and Facilities as Forums for Speech* ) (2002).

Finally, in *ACT–UP* the government could all too conveniently close its forum to a disfavored group one day, then re-open it to a favored group the next. Here no one disputes that plaintiff's "in-your-face" adamance (upon finding all of the free copies of this publication removed from the "free-lit" table, he called the police, filed an Open Records Act request, taped those he confronted, wrote a scathing letter, and put up a protest sign, *see* exhibits to doc. ## 5, 20), combined with his talent for attracting publicity, *see* www.southern-voice.com/atlanta/ 021011newsletter.php3?pub=atl (site as of 11/19/02), virtually precludes the use of such tactics here. In short, there is a world of difference between closing a community library's "lobby-table" forum and closing a legislative gallery.

Also distinguishable is *Hopper*, 241 F.3d at 1081–82 (Although city was not required to open its property for display of artwork, and was not required to leave it open for such display indefinitely, it could not, absent some compelling government interest, open property to some and close it to others solely in order to suppress content of protected expression), on which Marcus also relies. Doc. # 21 at 4. The plaintiffs sought no injunctive relief there, *id.* at 1070, and the court's analysis simply pre-

sumes that the city in that case would selectively open and close its forum, *id.* at 1082—something the legislature in *ACT-UP* likewise could easily do. Here the plaintiff does not contend that the forum *sub judice* will be selectively reopened (nor is there any evidentiary basis to suppose so).

## H. Other Constitutional Claims

Other than recite general due process and equal protection grounds,[22] plaintiff has failed to substantively demonstrate how relief premised on violations of those rights would support preliminary injunctive relief. The same may be said for his State-law claims. *See* doc. # 4. Nor will the Court argue his case for him. *See U.S. v. Burkhalter,* 966 F.Supp. 1223, 1225 n. 4 (S.D.Ga.1997) ("[i]t is not the province of this Court to raise issues on behalf of litigants before it"). To the extent plaintiff may be said to be advancing a "prior restraint" claim, *see* doc. # 4 at 5 n. 1, the Court finds it frivolous on its face.

## IV. *CONCLUSION*

It may be that "[a] First Amendment jurisprudence yielding these results does not promote speech but represses it." *Forbes,* 523 U.S. at 682, 118 S.Ct. 1633.

But how many tents in the intellectual desert are never set up for fear that unwanted camels might come along? Such questions make lawyers rich and law reviews thick. Judges, meanwhile, must draw lines in the shifting sands of First Amendment law.

It nevertheless is important to emphasize the limits of this ruling. It does not reach the authority of librarians to prevent library *patrons* from reading what they want. Nor does it address what rights patrons or content providers may have to constrain librarians to carry or not carry a given publication.[23]

Rather, it reaches only the narrow issue presented: Whether a library, having created a hybrid limited/non-public forum for free expression in its front lobby, can constitutionally close it, even with censorious *intent,* where the resulting *effect* is content-neutral (*i.e.,* all private-content providers are affected equally; when the tent is folded, all such camels are sent back into the desert).

Because prevailing case law says it may, the motion of plaintiffs Ronald Marcus and *The Gay Guardian* for a preliminary injunction (doc. # 3) is **DENIED,** as is defendants' request for oral argument (doc. # 17). In light of this result, it is not

---

**22.** The basis for this claim was underscored in *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972):

> Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an equality of status in the field of ideas, and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on

> the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone.

*Id.* at 96, 92 S.Ct. 2286. *Mosley* overturned a statute that prohibited all protests except labor picketing near a school. *Id.* at 101–02, 92 S.Ct. 2286. It thus constitutionally invalidated *selective* forum opening/closing, while here no such selectivity has been shown. Instead, the Library may be said to have brought down its entire tent.

**23.** The American Library Association has generated a "Library Bill of Rights" addressing this issue. *See* www.ala.org/work/freedom/lbr.html# rights (site as of 11/19/02); *see also American Library Ass'n,* 201 F.Supp.2d at 420.

necessary to reach defendant Gail Edenfield's arguments. *See* doc. # 18.